Lynda L. WATT, Plaintiff–Appellee,

v.

CITY OF RICHARDSON POLICE DE-
PARTMENT, Defendant–Appellant.

No. 87–1302.

United States Court of Appeals,
Fifth Circuit.

July 15, 1988.

D. Bradley Dickinson, Janetta S. Walls,
M. Leigh Bartlett, Dallas, Tex., for defend-
ant-appellant.

Douglas A. Larson, Dallas, Tex., for
plaintiff-appellee.

Before GARWOOD and JONES,
Circuit Judges, and BLACK *, District
Judge.

EDITH H. JONES, Circuit Judge:

Lynda Watt was subjected to a strip
search incident to her arrest for failure to
license her dog in the City of Richardson,
Texas. Understandably outraged by this
incident, she filed a civil rights action pur-
suant to 42 U.S.C. § 1983 and recovered
damages against the city. The district
court concluded that a portion of the city's
policy governing the conduct of visual strip
searches violated the fourth amendment on
its face and as applied to Watt. On appeal,
the City of Richardson challenges only the
district court's finding that the search was
constitutionally invalid. We affirm the
judgment, because a strip search was un-
constitutional under the facts here present-
ed, but we do not invalidate the city's poli-
cy.[1]

---

* District Judge of the Southern District of Texas,
sitting by designation.

1. The liability and damages phases of the case
were tried separately. After the liability deter-

mination by bench trial, damages were assessed
by a jury in the amount of $20,000 in compensa-
tory damages and $20,000 for attorneys fees and
costs.

## BACKGROUND

On March 3, 1985, Lynda Watt, accompanied by her 5–year–old son, was stopped by Officer Watson of the Richardson Police Department for operating a motor vehicle with an expired inspection sticker. Upon being informed that the automobile was borrowed from her mother's estate, Officer Watson decided only to issue a warning to Watt. The results of a routine computer check on Watt revealed, however, an outstanding arrest warrant issued for failure to register her dog in the City. Although this offense was punishable only by a fine, Watson was required to arrest Watt.

Watt cooperated politely with Officer Watson during the initial period of her short custody. She did not appear to be under the influence of drugs or alcohol. Watson's search of her purse revealed nothing unusual or suspicious. At the police station, Watt volunteered the necessary booking information, including the admission that in 1974 she had been convicted of a minor drug offense. This conviction had not appeared in the police computer search of her criminal record until she gave the police her surname from a previous marriage.[2] Watt underwent a pat-down search.

At some point, Watt was informed that she must post a $160 cash bond, and not having the cash on hand, she called a neighbor to deliver the bond money and pick up her son from the police station. The police were aware that Watt's release would shortly be forthcoming.

Watt was then advised that because of her "criminal history" she must submit to a visual strip search pursuant to the city's policy which pertained to any arrestee detained on a weapons, shoplifting or drug charge, *or who had a history of any such offense.* Watt reacted like a "caged animal." Despite vigorous protests, she finally submitted to a strip search, including a visual body cavity inspection, by a female communications officer of the Richardson Police Department. The search complied with city policy, in that it was performed in a holding cell barren of windows or television cameras so that no one except the communications officer and her female trainee could observe. The strip search, like the previous searches, was negative.

Watt was placed in a jail cell for between five and ten minutes until she was released on bond. Approximately 54 minutes elapsed between her arrest and release.

## ANALYSIS

■ Analysis of the city's strip search policy and of the actual search conducted on Watt begins, and practically ends, with the Supreme Court's decision in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Not the least significant of the Court's determinations in that case was its approval of a policy of a federal pretrial detention center in New York City that required strip searches of all detainees after they received contact visits from outsiders. The Court found this policy a reasonable means to prevent and deter the smuggling of contraband and weapons into the facility, where they could endanger both guards and prisoners. In so doing, it struck the fourth amendment balance in favor of deference to prison authorities' views of institutional safety requirements against the admittedly legitimate claims of inmates not to be searched in a humiliating and degrading manner. The Court explained its conclusion as consistent with the customary standards of fourth amendment jurisprudence:

The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted,

---

**2.** On June 24, 1974, plaintiff entered a guilty plea to the offense of unlawfully obtaining phenmetrazine, a controlled substance, by use of a forged prescription. She was placed on two years probation, and after completing 16 months, the judgment was set aside and the indictment dismissed. Further, she was "released from all penalties and disabilities resulting from the judgment of conviction in this case." Joint Pre–Trial Order Stipulation 4.

the justification for initiating it, and the place in which it is conducted.

441 U.S. at 558–559, 99 S.Ct. at 1884.

Following *Bell,* the courts of appeals have upheld prison strip search policies governing inmates where justified by the demands of institutional security. *See, e.g., Hay v. Waldron,* 834 F.2d 481 (5th Cir.1988); *Goff v. Nix,* 803 F.2d 358 (8th Cir.1986), *cert. denied,* —— U.S. ——, 108 S.Ct. 115, 98 L.Ed.2d 73 (1987); *Arruda v. Fair,* 710 F.2d 886 (1st Cir.), *cert. denied,* 464 U.S. 999, 104 S.Ct. 502, 78 L.Ed.2d 693 (1983). Searches of minor offense arrestees who would be detained pending the posting of bond, often for short periods of time, have been scrutinized much more closely. *Stewart v. Lubbock County, Texas,* 767 F.2d 153 (5th Cir.1985), *cert. denied,* 475 U.S. 1066, 106 S.Ct. 1378, 89 L.Ed.2d 604 (1986); *Giles' v. Ackerman,* 746 F.2d 614 (9th Cir.1984), *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985); *Mary Beth G. v. City of Chicago,* 723 F.2d 1263 (7th Cir.1983); *Logan v. Shealy,* 660 F.2d 1007 (4th Cir.1981), *cert. denied sub nom. Clements v. Logan,* 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982).[3] Exemplary of these decisions is *Stewart v. Lubbock County,* 767 F.2d 153, in which this court invalidated a blanket strip search policy that had ensnared plaintiffs arrested for public intoxication and issuing a bad check. We held that, "Because Lubbock County's strip search policy was applied to minor offenders awaiting bond when no reasonable suspicion existed that they *as a category of offenders or individually* might possess weapons or contraband," the policy violated the fourth amendment. *Stewart,* 767 F.2d at 156 (emphasis added). The perhaps enigmatic phrase "category of offenders" was explained more fully by a Ninth Circuit decision which, reaching the same result as

that in *Stewart,* described the fourth amendment standard affirmatively:

... we hold that arrestees charged with minor offenses may be subjected to a strip search only if jail officials possess a reasonable suspicion that the individual arrestee is carrying or concealing contraband. Reasonable suspicion may be based on such factors as the nature of the offense, the arrestee's appearance and conduct, and the prior arrest record. (citations omitted)

*Giles,* 746 F.2d at 617.

■ The Richardson strip search policy lies analytically between the prisoner and arrestee search cases, because it seeks to define the classes of offenders not yet incarcerated whose characteristics would suggest that they may pose a threat to prison security if they are not subjected to strip search. Richardson Police Department General Order 8.2–83 § II(b)(3) provides in pertinent part:

3. A "strip search" will be conducted only on charges of narcotics, shop-lifting, weapons, and/or for a criminal history of each above charge. On special circumstances an arresting officer may request a strip search but he should be ready to articulate his reasons for such a request. This search will be made in a restroom area of the jail. At no time will a strip search be conducted in view of TV cameras or other officers of the opposite sex.[4]

Watt does not challenge the propriety of strip searches conducted prior to incarceration on charges of narcotics, shoplifting or weapons violations. Such a challenge would be fruitless. *See, e.g., Lusby v. T.G. & Y. Stores, Inc.,* 749 F.2d 1423, 1434 (10th Cir.1984), *vacated on other grounds,* 474 U.S. 805, 106 S.Ct. 40, 88 L.Ed.2d 33 (1985); *Giles,* 746 F.2d 614; *Dufrin v. Spreen,* 712 F.2d 1084 (6th Cir.1983). Reasonableness under the fourth amendment must afford

---

3. Strip searches of prison employees and visitors have been held by some courts to require reasonable suspicion under the fourth amendment. *McDonell v. Hunter,* 809 F.2d 1302 (8th Cir.1987); *Security and Law Enforcement Employees, Dist. C. 82 v. Carey,* 737 F.2d 187 (2d Cir.1984); *Hunter v. Auger,* 672 F.2d 668 (8th Cir.1982); *Weber v. Dell,* 804 F.2d 796 (2d Cir. 1986); *Hill v. Bogans,* 735 F.2d 391 (10th Cir. 1984).

4. After the events leading to this action, the city's policy was amended to replace "narcotics" with "violation of the Controlled Substance Act."

police the right to strip search arrestees whose offenses posed the very threat of violence by weapons or contraband drugs that they must curtail in prisons.

The issue on which Watt and the district court focused their attention was the validity of strip searches conducted because of an arrestee's criminal history of any such charge.[5] The district court found the "criminal history" basis for a strip search untenable because the policy could be applied "regardless of the infraction for which the arrest is made and no matter how ancient the 'criminal history.'" According to the district court, anyone arrested with a criminal history on a named charge, regardless of the disposition of the case, is liable to be strip searched. Even the term "criminal history", according to the district court, was so vague that the court believed, contrary to the defendants' testimony, it was not limited to convictions and arrests.

■ Although, as will be seen, we conclude that Ms. Watt's criminal history did not justify her strip search, we disagree with the district court's conclusion that the city's policy is too broad *ever* to justify strip searches of persons with a criminal history of narcotics, weapons or shoplifting violations. First, the wholesome principle that we must not decide constitutional cases not presented to us commands that we construe the Richardson policy as applied rather than on the basis of general hypotheticals.[6] For every possibly unconstitutional application of the strip search policy that we or the district court could conceive, there is an equally compelling hypothetical in which a person's criminal history would strongly suggest the need for a strip search. It seems intuitively obvious, for instance, that if the Richardson police arrested a suspect on a minor charge such as passing a bad check and,

preparatory to placing him in their jail, found that he had been arrested previously and was then awaiting trial on major narcotics trafficking charges, a strip search would be warranted. The policy is thus susceptible of constitutional application. Conducting strip searches of arrestees who were found to have a history of weapons or shoplifting charges would also be justifiable in many instances. It is jurisprudentially sound, and consistent with *Bell*'s requirement of deference to law enforcement authorities, to construe this policy on a case-by-case basis, if necessary, rather than to throw it out.

Second, unlike the district court, we discern sound reasoning behind the city's authorization of strip searches based on criminal history. The municipal police chief testified that criminal history is relevant to a suspect's propensity to be involved in later offenses. Between 4,500 and 5,000 prisoners are booked into the Richardson jail each year, and misdemeanor prisoners are occasionally housed with the felons because of a lack of space. People are continuously trying to smuggle drugs into the city jail. Thus, a suspect jailed even temporarily on a minor offense could have the opportunity, if not searched, to smuggle in weapons or contraband. Limiting the searches generally to those offenders charged with or having a criminal history of narcotics, shoplifting or weapons charges is not an irrational attempt to foster jail security while restricting the scope of strip searches.

The police officers also pointed out that only the last arrest date is shown on the NCIC computerized criminal history available to police departments, and thus, in the majority of cases, they are unaware of the exact dates of a suspect's criminal history. This imprecision, together with the wide range of possible prior offenses, makes it impossible to set a precise antecedent limit

**5.** Watt also contends that the literal interpretation of the city strip search policy only permits such intrusions if the arrested person had a conjunctive history of narcotics, shoplifting *and* weapons charges. Although its grammar is not entirely satisfactory, the policy would be rendered almost meaningless unless it permits a strip search for a history of *any* of such viola-

tions. The city so construed the policy, and we find its construction sensible.

**6.** In *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), the Supreme Court declared unconstitutional only *as applied* a Tennessee statute authorizing the use of deadly force. 471 U.S. at 6, 105 S.Ct. at 1698.

on the criminal history that could justify a strip search. Unlike the district court, however, we are unwilling to invalidate this part of the policy because of its inherent imprecision. We view this factor instead as counselling discretion on our part and on the part of the police. *Bell* met a similar contention against the detention facility's strip search policy as follows:

> Nor do we doubt, as the District Court noted, that on occasion a security guard may conduct the search in an abusive fashion. ... Such an abuse cannot be condoned. The searches must be conducted in a reasonable manner ... (citation omitted)

441 U.S. at 560, 99 S.Ct. at 1885.

The solution to unconstitutional application of the policy, we infer, lies in a case-by-case approach.

To conclude that a policy permitting strip searches based on an arrestee's prior criminal history is defensible in some cases under the fourth amendment does not, of course, suggest that such strip searches are always justifiable. The caselaw cited above amply demonstrates the limits of permissible strip searches in individual cases. The arrestee's offense may be so minor, the prior criminal history so innocuous or ancient, and his or her characteristics so inconsistent with any rational fear that prison security is jeopardized as to undermine entirely the reasonableness of a particular strip search. Such a search is undeniably offensive. Lynda Watt's case represents a catalogue of reasons *not* to conduct a strip search based on criminal history alone.

Not only was she arrested on a very insubstantial offense, but the police also had no reason, until she offered the necessary information to them, even to suspect that she might have been involved in a prior drug offense. Her cooperativeness, obvious sobriety, and rationality (until she was informed of the impending strip search) should have been counted in her favor by the police, as well as her polite acquiescence in searches of her purse and exterior person. The venerable age of the prior conviction, the fact that it was ex- punged from her record following successful completion of probation, and the lack of any intervening arrests should have detracted from the fear that she could have been a recidivist.

There are, additionally, strong indications in the record that Ms. Watt need not have been incarcerated even for the five or ten minutes that she endured in a cell, in which case no cause for a strip search arose. The police were aware that her friend was on the way with bail money, and more importantly, to pick up her son. Although the police officers testified that the certainty of making bail is always subject to question, we doubt that neighbors routinely fail to retrieve children from the jail. The totality of the circumstances overwhelmingly vindicate the district court's findings that Ms. Watt was not a likely smuggler of weapons or contraband into the jail, that she probably should not even have been placed in a cell, and that prison security would not have been at all jeopardized by the failure to conduct a strip search and visual body cavity search on her. This search was therefore unconstitutional under the reasonableness standard of the fourth amendment and *Bell.*

For the foregoing reasons, the judgment of the district court is *AFFIRMED.*