Oscar D. WILLIAMS, et al., Plaintiffs,

v.

KAUFMAN COUNTY, et al., Defendants.

No. CIV.A. 3:97–CV–0875–L.

United States District Court,
N.D. Texas,
Dallas Division.

Feb. 7, 2000.

---

William Charles Bundren, Dallas, TX, for plaintiffs.

S. Cass Weiland, Caryn Carson, Sheinfeld, Maley & Kay, Dallas, TX, for defendants.

### MEMORANDUM OPINION AND ORDER

LINDSAY, District Judge.

Before the court is Defendants' Supplemental Motion for Summary Judgment, filed November 30, 1998. Upon consideration of the motion, Plaintiffs' response, Defendants' reply, the entire summary judgment record, and the applicable law, the court **grants** in part and **denies** in part Defendants' Supplemental Motion for Summary Judgment. Specifically, the court **grants** summary judgment on Plaintiffs' verbal harassment and invasion of

privacy claims brought under 42 U.S.C. § 1983, **grants** summary judgment with respect to the Group 1 Plaintiffs'[1] claim of unlawful detention, **grants** summary judgment on all claims of Karran Brown, **denies** summary judgment on Plaintiffs' illegal strip search, **denies** summary judgment on the unlawful detention claims with respect to the Group 2 Plaintiffs, and **denies** summary judgment on Plaintiffs' policy claims.

## I. *Procedural and Factual Background*

This action was filed by Plaintiffs pursuant to 42 U.S.C. § 1983 against Kaufman County and Kaufman County Sheriff Robert Harris. On November 12, 1998, the court adopted the findings, conclusions, and recommendation of the magistrate judge and overruled the objections filed by the parties. Specifically, the court granted Defendants' Motion for Summary Judgment regarding the following matters: Plaintiffs' excessive force claim; Plaintiffs' claim for damages resulting from an alleged violation of the Texas Constitution; and Plaintiffs' state law claims for assault, battery, intentional infliction of emotional distress, and civil conspiracy. The court denied Defendants' Motion for Summary Judgment with respect to Plaintiffs' claim for declaratory relief regarding Defendants' alleged violations of Article 1, Section 9 of the Texas Constitution. Defendants did not raise the following matters in their initial motion for summary judgment: Plaintiffs' claims based upon illegal strip search, unlawful detention, invasion of privacy, and verbal harassment based on race. Defendants raised these issues for the first time in their reply to Plaintiffs' Response to Defendants' Motion for Summary Judgment. The court directed Defendants to file a second motion for summary judgment by November 30, 1998, to address these claims.

Sheriff Harris contends that he is entitled to qualified immunity with respect to Plaintiffs' Section 1983 claims, including the allegedly illegal strip search, unlawful detention, invasion of privacy and verbal harassment. Kaufman County contends that it is not liable to Plaintiffs because they suffered no constitutional injury as a result of a policy or custom of Kaufman County. Both Defendants have moved for summary judgment, seeking dismissal of the claims. Plaintiffs, of course, oppose Defendants' Supplemental Motion for Summary Judgment.

This lawsuit results from a search warrant that was executed at the Classic Club (the "Club") in Terrell, Texas, on the evening of April 21, 1995. Kaufman County Sheriff Robert Harris obtained a warrant from a local magistrate after a confidential informant provided him information that certain individuals were selling rock cocaine at the Club. The warrant authorized officers to search the Club and "all other buildings, structures, and vehicles on said premises" and arrest five named individuals (Ronnie "Fat" Jackson, "Head" Jackson, Harold Jackson, Kirk Martin and Karron (sic) Brown) who were suspected of criminal activity.

The Sheriff's Department considers the execution of a narcotics warrant a "hazardous entry" when there is a substantial likelihood that weapons will be present on the scene. During a previous search of the Club in March 1994, officers found large quantities of crack cocaine and marijuana and drug paraphernalia, and found a concealed .25 caliber automatic pistol on a person. After the March 1994 search was conducted, Sheriff Harris received an anonymous telephone call in which the caller threatened to "blow [his] head off" if he ever returned to the Club.

The warrant was executed by officers from several different Kaufman County

---

1. A description of each "Group" of Plaintiffs is provided at the end of Section I of this opinion.

law enforcement agencies pursuant to a mutual aid agreement. Although an officer might have been employed by another department, the mutual aid agreement required the officer to be under the control of the specific department that requested his assistance. Since Sheriff Harris coordinated the raid and was present during the execution of the warrant, all the officers involved were acting under his control and supervision. When the officers entered the Club, drugs were visible on the floor and tables. In order to secure the premises, the officers then handcuffed everyone present and ordered them to lie down on the floor. Each person was strip searched and his or her name was run through a police computer to check for outstanding warrants. The individuals who were not in possession of drugs and did not have outstanding warrants were led outside and held until the search was completed, which lasted, by some accounts, up to four hours. The individuals, according to Defendant Harris, were not released because of safety concerns. The officers detained everyone present at the Club, fearful that the released individuals might group together, return with firearms, and create "an extraordinarily hazardous and racially charged environment." Sheriff Harris also believed that the detention of the individuals was necessary to ensure an orderly and efficient execution of the search warrant.

The original Plaintiffs are seventeen individuals who were detained and searched the evening the search warrant was executed at the Club. They are: Oscar D. Williams, Jr., Thomas Gene Brown, Leonard Avery, Francis Booker, Cecil Jackson, Jacquelynn Surrell, Ricky Lewis, Brenda Allen, James McDonald, Sylvester Lewis, L.B. Brumley, Clifford Gibson, Gloria Surrell, Alisa Allen, John Jackson, Karran Brown, and David Brown.[2] With the exception of Karran Brown, none of Plaintiffs was named in the warrant. Four Plaintiffs

(Oscar Williams, Jr., Clifford Gibson, James McDonald, and Leonard Avery) were not inside the Club or on the premises when the search began. Both Oscar Williams, Jr., and Clifford Gibson were inside of their respective vehicles driving on a public street when they were stopped and removed from their cars and brought inside of the Club. James McDonald had just left the Club and was told to return. Leonard Avery was asleep inside an apartment in his place of business, M.J. Carpets, which is a separate business adjacent to the Club. The Club's address was 606 South Adelaide, and M.J. Carpets' address was 602 South Adelaide. These four Plaintiffs will collectively hereinafter be referred to as "Group 2." The remaining Plaintiffs who were present at the Club the night the search warrant was executed will be referred to as "Group 1."

## II. *Summary Judgment Standard*

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Ragas v. Tennessee Gas Pipeline Company*, 136 F.3d 455, 458 (5th Cir.1998). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

---

**2.** Plaintiff David Brown was dismissed without prejudice on April 28, 1998; Plaintiff John Jackson was dismissed without prejudice on May 21, 1998; and Plaintiff Sylvester Lewis was dismissed with prejudice on October 14, 1998.

574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Ragas,* 136 F.3d at 458.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler,* 73 F.3d 1322, 1325 (5th Cir.1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994). The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Ragas,* 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support Plaintiff's opposition to Defendants' motion. *Id., Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915–16 & n. 7 (5th Cir.), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992) "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Disputed fact issues which are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548.

### III. *Analysis*

### A. Doctrine of Qualified Immunity

■ Government officials who perform discretionary functions are entitled to the defense of qualified immunity, which shields them from suit as well as liability for civil damages if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). A defendant official must affirmatively plead the defense of qualified immunity. *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). Defendant Harris has pleaded this defense.

In deciding a motion for summary judgment that raises the defense of qualified immunity, the court must *first* decide "whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Conn v. Gabbert,* 526 U.S. 286, 119 S.Ct. 1292, 1295, 143 L.Ed.2d 399 (1999), citing *Siegert v. Gilley,* 500 U.S. 226, 232–33, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); *see also Kerr v. Lyford,* 171 F.3d 330, 339 (5th Cir.1999). The second prong of the test requires the court to make two separate inquiries: whether the right allegedly violated was clearly established at the time of the event giving rise to the plaintiff's claim, and if so, whether the conduct of the defendant was objectively unreasonable. *Evans v. Ball,* 168 F.3d 856, 860 (5th Cir. 1999). Although many cases continue to state that the determination of the qualified immunity issue requires the application of a bifurcated test, the analytical framework for resolving issues of qualified immunity necessarily requires, or may require, a *three-step* analysis. *See Kerr v. Lyford,* 171 F.3d at 339 (5th Cir.1999); *Evans v. Ball,* 168 F.3d at 860; *Hare v. City of Corinth,* 135 F.3d 320, 326 (5th Cir.1998); *Eugene v. Alief Indep. Sch. Dist.,* 65 F.3d 1299, 1305 (5th Cir.1995), *cert denied,* 517 U.S. 1191, 116 S.Ct. 1680, 134 L.Ed.2d 782 (1996).

Whether a defendant acted within the scope of his authority performing a discretionary function and whether a reasonable official in his position would have deemed his conduct unconstitutional are not to be considered by the court unless each part of the three-step inquiry has been answered affirmatively on behalf of the plaintiff. *Kerr v. Lyford,* 171 F.3d at 339. In other words, only after a plaintiff demonstrates the existence and violation of a clearly established constitutional or statutory right is the defendant required to show that he was performing a discretionary function and that a reasonable official would not have considered his actions to be unconstitutional at the time of the incident in question. *Id.* at 338.

A right is "clearly established" only when its contours are sufficiently clear that a reasonable public official would have realized or understood that his conduct violated the right in issue, not merely that the conduct was otherwise improper. *See Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Foster v. City of Lake Jackson,* 28 F.3d 425, 429 (5th Cir.1994). Thus, the right must not only be clearly established in an abstract sense but in a more particularized sense so that it is apparent to the official that his actions [what he is doing] are unlawful in light of pre-existing law. *Anderson v. Creighton,* 483 U.S. at 640, 107 S.Ct. 3034; *Stefanoff v. Hays County,* 154 F.3d 523, 525 (5th Cir.1998); and *Pierce v. Smith,* 117 F.3d 866, 871 (5th Cir.1997).

In *Anderson v. Creighton,* 483 U.S. at 641, 107 S.Ct. 3034, the Supreme Court refined the qualified immunity standard and held that the relevant question is whether a reasonable officer or public official *could have believed* that his conduct was lawful in light of clearly established law and the information possessed by him. If public officials or officers of "reasonable competence could disagree [on whether an action is legal], immunity should be recognized." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *Gibson v. Rich,* 44 F.3d 274, 277 (5th Cir.1995) (*citing Babb v. Dorman,* 33 F.3d 472, 477 (5th Cir.1994)). Conversely, an official's conduct is not protected by qualified immunity if, in light of clearly established pre-existing law, it was apparent the conduct, when undertaken, would be a violation of the right at issue. *Foster v. City of Lake Jackson,* 28 F.3d at 429. To preclude qualified immunity, it is not necessary for a plaintiff to establish that "the [specific] action in question has previously been held unlawful." *Anderson v. Creighton,* 483 U.S. at 640, 107 S.Ct. 3034; however, for an official to surrender qualified immunity, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in the circumstances." *Pierce v. Smith,* 117 F.3d at 882; *Stefanoff v. Hays County,* 154 F.3d at 525. With these standards for summary judgment and qualified immunity in mind, the court now addresses the issues raised in Defendants' Supplemental Motion for Summary Judgment.

## B. Illegal Strip Search

### 1. Allegation of Constitutional Right

Sheriff Harris contends that he is entitled to qualified immunity on this claim. The court, however, must first address whether Plaintiffs have alleged the violation of a constitutional right. *Conn,* 119 S.Ct. at 1295. Plaintiffs allege that the strip search was conducted in violation of their constitutional rights. Plaintiffs contend that the search exceeded the scope of the warrant in violation of the Fourth Amendment. Further, they argue that the Fourth Amendment ensures that they will be free from warrantless strip searches in the absence of any probable cause or reasonable suspicion to believe that any of the Plaintiffs were concealing contraband or weapons underneath their clothing.

The Warrant Clause of the Fourth Amendment requires that the warrant "particularly describe the place to be searched and the persons or things to be seized." U.S. Const. Amend. IV. The scope of a lawful search is "defined by the object of the search and the places in which there is probable cause to believe that it may be found." *Maryland v. Garrison*, 480 U.S. 79, 84, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987)(*quoting U.S. v. Ross*, 456 U.S. 798, 824, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982)). The requirement that warrants particularly describe the objects to be seized protects individual privacy interests, thereby preventing general searches. The Fourth Amendment is violated when a law enforcement officer conducts an unreasonable search.

The warrant that Sheriff Harris obtained authorized the law enforcement officers to "enter the suspected place described in said Affidavit and to there search for the personal property described in said Affidavit and to seize same and to arrest and bring before [the magistrate] each suspected party named in the Affidavit." The Affidavit defined the "suspected place" as that of the Club, while describing the "suspected party" to include five individuals specifically named. The only Plaintiff who was specifically named in the warrant was Karran Brown.

In *Ybarra v. Illinois*, 444 U.S. 85, 88, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), a warrant was obtained allowing a search of "the following person or place: ... [T]he Aurora Tap Tavern.... Also the person of 'Greg,' the bartender, a male white with blondish hair appx (sic) 25 years." The search warrant allowed the officers to search for evidence of heroin. *Id.* After entry into the establishment, officers conducted a pat-down of all of the customers in the tavern. *Id.* The Court noted that if the judge issuing the warrant intended to allow a search of every person within the establishment, he would not have specifically stated "Greg." *Id.* at 90 n. 2, 100 S.Ct. 338. The Court determined that officers lacked probably cause at the time the search warrant was issued to believe that any person at the tavern, with the exception of Greg, would be or had been violating the law. *Id.* at 90, 100 S.Ct. 338. Furthermore, the Court stated that probable cause did not exist at the time the search was actually conducted. *Id.* The Court further stated, "Every patron who walked into the Aurora Tap Tavern on March 1, 1976, was clothed with a constitutional protection against an unreasonable search or an unreasonable seizure." *Id.* at 91, 100 S.Ct. 338.

■ Plaintiffs have a Fourth Amendment right to be free from searches in the absence of individualized probable cause or reasonable suspicion. The police officers' alleged necessity to conduct the strip search does not outweigh the Plaintiffs Fourth Amendment rights in this case. As Plaintiffs have alleged that they were subjected to an unlawful and unreasonable strip search, they have alleged a violation of a constitutional right. Therefore, Plaintiffs have satisfied the first prong of *Conn.*

### 2. Clearly Established Right

■ Now that the court has determined that Plaintiffs have alleged a constitutional right, the court must determine whether the right was clearly established in April 1995. The court concludes that the right to be protected from an illegal strip search was clearly established in April 1995. A right is "clearly established when it is clear that a reasonable officer would have acknowledged that his conduct violated the right at issue." *Anderson v. Creighton*, 483 U.S. at 640, 107 S.Ct. 3034. The first question is whether it was clearly established that Plaintiffs were entitled to a constitutional right to be free from an unreasonable search, absent a showing of probable cause. In *Ybarra*, a customer was subjected to a search when he was present at an establishment subject to a search warrant. *Ybarra v. Illinois*, 444 U.S. at 88, 100 S.Ct. 338. The Court in that case found that the officers did not

have particularized probable cause to conduct a pat-down of Ybarra. *Id.* at 91, 100 S.Ct. 338. The Court stated: "Where the standard is probable cause, a search or a seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided simply by pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be." *Id.* Likewise, every Plaintiff at the Club was entitled to a constitutional right against an unreasonable search. Although the police had probable cause to search the Club and the persons described in the warrant, they did not have probable cause to strip search every individual in the Club and persons who were not even present on the premises. A strip search in this instance is legally permissible only if an officer has an individualized, reasonable suspicion that the arrestee is hiding weapons or contraband, and this suspicion must be specific to that individual. *See Watt v. City of Richardson Police Dept.,* 849 F.2d 195, 197 (5th Cir.1988). In the present case, at best, speculation existed regarding the presence of contraband on the individual Plaintiffs. Speculation simply does not create the reasonable, individualized suspicion that would justify a strip search.

Based on *Ybarra* and *Watt,* which were decided fifteen and seven years, respectively, before the search in this case occurred, the court finds that the right to be free from an unreasonable strip search was clearly established. In *Ybarra,* the court held unconstitutional the pat-down and the reaching into an individual's pants pocket. In light of the holding in *Ybarra,* it would be apparent to a reasonable officer that conducting an intrusive strip search would be constitutionally impermissible. Plaintiffs' have satisfied the second prong of *Conn.* Having resolved this issue, the court now determines whether Sheriff Harris' conduct was objectively unreasonable.

### 3. Objectively Unreasonable Conduct

■ In deciding whether Sheriff Harris' conduct was objectively unreasonable, the court must determine whether a reasonable officer could have believed that Sheriff Harris' conduct was lawful in light of clearly established law. If reasonable officers could disagree whether the strip search was unconstitutional, Sheriff Harris is entitled to qualified immunity. *See Malley v. Briggs,* 475 U.S. at 341, 106 S.Ct. 1092. In order to determine whether a search is reasonable, the individual's Fourth Amendment interest must be weighed against the necessity for a particular type of search. *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The court should consider "the scope of the intrusion, the manner in which it is executed, the justification for initiating it, and the place in which it is conducted." *Id.* If under *Ybarra* a less intrusive search, a pat-down, was held to be unconstitutional, it should have been even more evident and unequivocally clear that a much more intrusive strip search would not be constitutionally permissible. Defendants argue that when the warrant was executed, there was reason to believe that weapons might be present. At most, this might have authorized a pat-down to check for weapons for the safety of the officers; however, it is fatuous and unreasonable to suggest that a highly intrusive strip search was necessary to protect the officers' safety. This dog simply will not hunt! Once the pat-down took place, the objective to ensure the officers' safety had been accomplished. The court concludes that, based upon the summary judgment evidence, a reasonable officer could not have believed that the conduct, requiring a strip search of both Plaintiffs who were not present at the Club, as well as Plaintiffs who were on the Club's premises, without probable cause or reasonable suspicion, was objectively reasonable. The sheriff and the officers under his control had no reasonable suspicion or probable cause to conduct the strip search.

■ Even if Defendants were able to establish probable cause of reasonable suspicion directed towards one of the Plaintiffs—Karran Brown—it still would not justify such an intrusive search—the strip search of all Plaintiffs. In *U.S. v. Afanador*, 567 F.2d 1325 (5th Cir.1978), an agent of the Drug Enforcement Administration (DEA) received information that one of the airline crew members would be arriving into the United States carrying cocaine. *Id.* at 1327. Upon arrival, all six crew members were subjected to strip searches. *Id.* at 1328. The court upheld the strip search as to the individual crew member who was the subject of the reasonable suspicion; however, the court held that reasonable suspicion was not satisfied with respect to the other crew members. *Id.* at 1330. The court unequivocally refused to allow the strip search of the remaining crew members and held that it would allow such an intrusive search only when reasonable suspicion is directed toward a specified individual. *Id.* at 1331. The court in that case also recognized that a reasonable belief that justifies "a particular search may not suffice to justify a more intrusive or demeaning search." *Id.* "The court must answer on a case-by-case basis whether the police were unreasonable in failing to use a less intrusive procedure to conduct their investigation safely." *U.S. v. Campbell*, 178 F.3d 345 (5th Cir.1999) (*quoting U.S. v. Sanders*, 924 F.2d 200, 206–07 (5th Cir.1993)). In analyzing unreasonableness, the question is not whether a viable alternative is available, but if officers were unreasonable when they did not acknowledge or pursue it. *U.S. v. Sanders*, *924 F.2d* at 204. Defendants have argued that to ensure the safety of officers, a strip search was conducted to locate possible weapons. This goal, without doubt, could have been accomplished through a viable alternative—a pat-down.

When Sheriff Harris obtained the warrant based upon an informant observing that five individuals were present during the selling of rock cocaine, probable cause existed to search and arrest the five individuals who were named in the Affidavit. Probable cause did not exist to search every other individual present at the Club when the search warrant was executed. When Sheriff Harris and other officers executed the search at the Club, cocaine was found to have been thrown on the floor and the table. Defendants argue that the warrant authorized the search for cocaine, and, therefore, every individual in the Club was searched because they were authorized to search where cocaine might be found—on the person. **Under Defendants' theory, an innocent person who was lost and happened to be in the Club to ask for directions or use the telephone would have been strip searched. Certainly, our Constitution would not permit such a degrading and humiliating search to be conducted against one who by mere coincidence appeared at the Club under the circumstances previously described.** The court finds the argument in which Defendants propose to justify the strip search unpersuasive and unreasonable. A search of an individual must be supported by probable cause which is particularized to that person. *Ybarra v. Illinois*, 444 U.S. at 91, 100 S.Ct. 338. "[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Id.* (citing *Sibron v. New York*, 392 U.S. 40, 62–63, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968)).

■ Defendants argue that the strip search was also used to ensure the safety of the officers. In support of their argument, Defendants allege that Sheriff Harris believed several customers would be armed. Defendants conducted a search in March 1994, prior to the one that is the subject of this lawsuit, and a concealed weapon was found. Further, the Defendants argue that oftentimes individuals present at the Club are armed and dangerous. An officer is allowed to conduct a pat-down in order to find weapons only when he reasonably believes that the person is in possession of a weapon. *Terry v.*

*Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The pat-down is authorized on a showing of reasonable suspicion—probable cause is not required. In *Ybarra,* every individual present at the tavern was subjected to a pat-down. The court in that case stated, "The 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though the person happens to be on premises where an authorized narcotics search is taking place." *Id.* at 94. With the exception of Karran Brown, Defendants have presented no evidence to support that they had a reasonable belief or suspicion that the individuals whom they strip searched were in the possession of a concealed weapon. The only evidence that Defendants have presented is that a weapon had been found on the premises before and their belief that the persons who frequented the Club would be in possession of a weapon. "The fourth amendment does not permit any automatic or casual transference of 'suspicion.' " *U.S. v. Afanador,* 567 F.2d 1325, 1331 (5th Cir.1978).

■ Karran Brown, a person described by the Warrant, was also strip searched the night the search warrant was executed. Plaintiffs argue the Affidavit did not give rise to probable cause as to Karran Brown. The Affidavit states that although the informant did not observe Karran Brown selling rock cocaine, he was present during the transaction. Furthermore, he made no attempt to stop the transaction. As a result, the court concludes that the officers did have probable cause to search Karran Brown for possession of cocaine. Therefore, the strip search and detention as conducted toward Karran Brown was not unreasonable under the Fourth Amendment.

### C. Unlawful Detention

### 1. Allegation of a constitutional right

■ Under the standards previously set forth by the court, the court finds that Plaintiffs' claim of unlawful detention is a right protected by the constitution and that such constitutional right was clearly established prior to April 1995. In applying the third factor, the court finds that Sheriff Harris is entitled to qualified immunity with respect to the unlawful detention claims of the Group 1 Plaintiffs who were on the premises when the officers executed the search warrant. The occupants of a premises being searched for contraband pursuant to a valid warrant may be lawfully detained while the search is being conducted. *Michigan v. Summers,* 452 U.S. 692, 705, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). The search warrant itself provides the "articulable facts" necessary to detain a person on less than probable cause. The Court reserved the question whether an usually lengthy detention might lead to a different conclusion. *Summers,* 452 U.S. at 705, 101 S.Ct. 2587. This admittedly is a close call here. The court has concerns regarding the length of the detention; nevertheless, the extended detention in this case does not abrogate the Sheriff's entitlement to qualified immunity, because officers of reasonable competence could disagree whether detaining Plaintiffs in this case for several hours while the search was being conducted violated their rights. Accordingly, Sheriff Harris is entitled to qualified immunity on the unlawful detention claims of the Group 1 Plaintiffs.

■ The court reaches a different conclusion with respect to the Group 2 Plaintiffs who were not present when the officers entered the premises. Oscar Williams and Clifford Gibson were removed from their cars on nearby streets and brought back to the Club. James McDonald had just left the Club and was told to return. Leonard Avery was taken from his apartment next door and brought in to be strip searched. The search warrant only authorized the officers to search buildings, vehicles, and structures "on the

premises." Sheriff Harris could not seize and detain these Plaintiffs without probable cause, and a reasonably competent officer would not have done so under the circumstances presented in this case. Officers of reasonable competence simply could not disagree on the legality of detaining the Group 2 Plaintiffs.

## D. Invasion of Privacy

Plaintiffs claim that the strip searches and visual inspection of body cavities were an invasion of their right to privacy because they did not take place in private and members of the opposite sex were present. Defendants contend that the invasion of privacy claims were not pleaded in Plaintiffs' Original Complaint. Plaintiffs filed their First Amended Original Complaint on March 27, 1998, which contains their invasion of privacy claims. The magistrate judge, however, unfiled Plaintiffs' motion to amend complaint on one occasion and denied Plaintiffs' motion for leave to amend their complaint. *See* Orders filed April 10, 1998, and June 3, 1998. Plaintiffs did not object to or seek review of the magistrate judge's ruling from the district court. The live pleading before this court is Plaintiffs' Original Complaint, which does not contain an invasion of privacy claim. Since the invasion of privacy claim has not been pleaded by Plaintiffs', it is not before the court and the court cannot consider it. Defendants are therefore entitled to summary judgment on this claim, and it will be dismissed.

## E. Verbal Abuse and Racial Epithets

 Plaintiffs claim that the Defendants engaged in racially motivated verbal harassment in violation of their constitutional rights during the execution of the search warrant. Officers executing the search warrant were Caucasian, and all Plaintiffs were African–American. Plaintiffs state that the officers engaged in racially motivated verbal abuse and harassment by referring to them as "niggers" and "coons" during the execution of the warrant. Plaintiffs also state that while they were detained, some officers mimicked the sound that a raccoon makes. Although Plaintiffs set forth these facts in their Response to Defendants' Motion for Summary Judgment and their Response to Defendants' Supplemental Motion for Summary Judgment, they, however, did not assert a Fourteenth Amendment violation in their Original Complaint. Neither the Fourteenth Amendment nor the phrase "equal protection of the laws" is even mentioned in Plaintiffs' Original Complaint; only the general term "racial slurs" is used in a conclusory fashion. This is insufficient to state a violation of the Equal Protection Clause under the Fourteenth Amendment. To state a claim, a plaintiff must allege that a state officer intentionally discriminated against him because of membership in a protected class. *Johnson v. Morel,* 876 F.2d 477, 479 (5th Cir.1989). To state a violation for use of racial epithets, a plaintiff must allege or demonstrate that an official using a racial epithet "engaged in some specific conduct, such as harassment, that deprived [him] of equal protection of the laws." *Williams v. Bramer,* 180 F.3d 699, 707 (5th Cir.1999). In *Williams,* the plaintiff actually pleaded an equal protection claim in his complaint. Since no Fourteenth Amendment claim was pleaded by Plaintiffs in this case, it is not before the court, and the court cannot consider it. Accordingly, Defendants are entitled to summary judgment on this claim.

 Even if Plaintiffs had properly pleaded an equal protection claim, Sheriff Harris would be entitled to qualified immunity because the law was not clearly established with respect to whether the use of a racial slur was enough to state a cause of action under the Fourteenth Amendment. In *Johnson,* the Fifth Circuit did not address the truth of Johnson's equal protection claim or express any opinion on the merits of the claim regarding the use of racial slurs. *Johnson v. Morel,* 876 F.2d at 479. What the Fifth Circuit

did make clear in July 1999 is that the officer using the racial epithet must have engaged in some conduct, such as harassment, that deprived the plaintiff of equal protection of the laws. *Williams v. Bramer*, 180 F.3d at 707. Prior to the *Williams* decision, the Fifth Circuit had declined to address or resolve this "thorny" issue. *Id.* at 706. *Williams* clarifies and sets forth the applicable standard necessary to allege or demonstrate an equal protection claim that involves the use of racial slurs. Before this standard, the parameters of this right were not clearly established or defined. Since these parameters were not clearly defined in April 1995, Sheriff Harris is entitled to qualified immunity. Accordingly, summary judgment is appropriate on the basis of qualified immunity.[3]

### F. Municipal Liability

Defendants contend that Plaintiffs have failed to "produce evidence of, or even identify, a policy or custom of the County which was the 'moving force' behind the alleged violation of their rights." Defendants' Supplemental Motion for Summary Judgment at p. 17. Plaintiffs contend that the actions which took place on the date in question were done "in the presence and pursuant to the direction of Kaufman County Sheriff, Robert Harris." Plain-

tiffs' Original Complaint at p. 11. Plaintiffs also have sued Sheriff Harris in his official capacity. Plaintiffs in essence are alleging that what took place at the Club was the standard operating procedure of the Kaufman County Sheriff's Department. In other words, a fair reading of Plaintiffs' Original Complaint is that the County has a policy, practice, or custom of encouraging, permitting, or authorizing its law enforcement officers to conduct illegal strip searches and illegal detention of citizens with whom they come into contact.[4]

Plaintiffs' suit against Sheriff Harris in his official capacity is treated as a claim against Kaufman County, the governmental entity of which Harris is an employee, representative, or official. *See Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); *Brooks v. George County*, 84 F.3d 157, 165 (5th Cir.), *cert. denied*, 519 U.S. 948, 117 S.Ct. 359, 136 L.Ed.2d 251 (1996). A governmental entity can be sued and subjected to monetary damages and injunctive relief under 42 U.S.C. § 1983 only if its official policy or custom causes a person to be deprived of a federally protected right. *Board of the County Commissioners v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); *Monell v. Department of So-*

---

3. Sheriff Harris is put on notice that such conduct today, in conjunction with what occurred during the execution of the search warrant, would be actionable. The court notes that, based on the current record, Defendants have really not denied that these racial slurs were used. If the evidence at trial establishes that the racial slurs were used, that they would be used in this day and time by law enforcement officials is sad and inexcusable. Use of such deplorable language only breeds contempt and disrespect for law enforcement officials. The court hopes that this was an isolated incident and not a presage of how the Kaufman County Sheriff's Department treats its African–American citizens.

4. Arguably, a fair reading of Plaintiffs' Original Complaint leaves one with the understanding that Plaintiffs are also alleging that Kaufman County has a policy of permitting, allowing, or authorizing its officers (1) to use

excessive force against citizens with whom they come into contact, (2) to use racially charged language during the execution of law enforcement activities, and (3) to invade the privacy of its citizens during the execution of law enforcement activities. The court need not address these matters, however, because the court has found that the underlying issue is not before the court or that there is no underlying violation regarding these alleged policies. When there is no underlying violation, the policy becomes irrelevant and is "quite beside the point." *Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986); see also *Saenz v. Heldenfels Bros., Inc.*, 183 F.3d 389, 392–3 (5th Cir.1999). In other words, if a person suffers no constitutional injury at the hands of the municipal officer, the alleged unconstitutional policy could not have been the cause of any harm to that person.

*cial Services of City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A governmental entity *cannot* be liable for civil rights violations under a theory of respondent superior or vicarious liability. *Id. See also Baskin v. Parker,* 602 F.2d 1205, 1208 (5th Cir.1979). Official policy is defined as:

1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the [county] lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

2. A persistent, widespread practice of [county] officials or employees which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents [county] policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the [county] or to an official to whom that body had delegated policy-making authority.

*Webster v. City of Houston,* 735 F.2d 838, 841 (5th Cir.1984); *Bennett v. City of Slidell,* 735 F.2d 861, 862 (5th Cir.1984). A plaintiff must identify the policy, connect the policy to the governmental entity itself and show that his injury was incurred because of the application of that specific policy. *Bennett v. City of Slidell,* 728 F.2d 762, 767 (5th Cir.1984), *cert. denied,* 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985). A plaintiff must establish that the governmental entity through its deliberate conduct was the moving force behind the injury or harm suffered and must establish a direct causal link between the governmental entity's action and the deprivation of a federally protected right. *Bryan County v. Brown,* 520 U.S. at 403–04, 117 S.Ct. 1382.

 Liability must rest on official policy, meaning the governmental entity's policy, and not the policy of an individual official. *Bennett,* 728 F.2d at 769. The official complained of must possess

...final authority to establish [county] policy with respect to the action ordered.... The official must also be responsible for establishing final government policy respecting such activity before the [county] can be held liable.... [W]hether an official had final policymaking authority is a question of state law.

*Pembaur v. City of Cincinnati,* 475 U.S. 469, 481–482, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). An employee, agency, or board of a governmental entity is not a policymaker unless the governmental entity, through its lawmakers, has delegated exclusive policymaking authority to that employee agency or board and *cannot* review the action or decision of the employee, agency or board. *See St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Worsham v. City of Pasadena,* 881 F.2d 1336, 1340–41 (5th Cir.1989).

Plaintiffs allege that Kaufman County should be liable for the allegedly illegal conduct on April 21, 1995, the day the search warrant was executed at the Club. Plaintiffs contend that Sheriff Harris is the person with the responsibility for final decision-making authority in the area of law enforcement and the execution of hazardous warrants. Furthermore, his department does not have a written policy which covers hazardous warrants; therefore, according to Plaintiffs, the policy must be derived from training and actual execution of the Warrant.

 The court first looks to state law in order to determine if Sheriff Harris possesses final decision-making authority with respect to law enforcement decisions. "[I]t has long been recognized that, in Texas, the county sheriff is the county's final policymaker in the area of law enforcement." *Colle v. Brazos County Texas,* 981 F.2d 237, 244 (5th Cir.1993)(*quoting Turner v. Upton County,* 915 F.2d 133, 136 (5th Cir.1990)); *see also Familias Unidas v. Briscoe,* 619 F.2d 391, 404 (5th Cir.1980). By virtue of being elected to

office, Sheriff Harris has the exclusive policymaking authority in the area of law enforcement, and no Kaufman County body or official can review the action or decisions of Sheriff Harris in the area of law enforcement. The court, therefore, concludes that Sheriff Harris is the final policymaker in the area of law enforcement for Kaufman County.

Sheriff Harris coordinated the execution of the warrant, was physically present, and was the ranking officer when the search warrant was executed. He stated in his deposition, that Kaufman County did not have a written policy for the execution of hazardous warrants. He also stated:

> If you were there and you were white or green or yellow or purple you would have been strip searched. If there was an individual that was—regardless of his color that was in this particular places, as much narcotics as we found in plain view, if he were naive enough to stay there, he probably would have been searched.

Deposition of Sheriff Harris at 139. The decision and act of Sheriff Harris to strip search all of the Plaintiffs because of their mere presence at the Club and to detain the Plaintiffs up to four hours while the strip searches took place was the official policy, practice, or custom of Kaufman County, because Sheriff Harris was the final policymaker in the area of law enforcement. This conclusion is simply unavoidable. Plaintiffs have produced sufficient evidence to raise a genuine issue of material fact concerning their claim that they were injured as a result of an unconstitutional policy, practice, or custom of Kaufman County. There is a material fact question whether the policy was adopted with " 'deliberate indifference' to its known or obvious consequences" and whether the policy was the " 'moving force' behind the constitutional violation." *See Snyder v. Trepagnier*, 142 F.3d 791, 795 (5th Cir. 1998). The question is whether Kaufman County has a policy or practice of authoriz-ing, encouraging, or permitting its law enforcement officers to conduct illegal strip searches and illegal detentions of citizens with whom they come into contact. Kaufman County is not entitled to summary judgment on the issue of county liability.

## IV. *Conclusion*

For the reasons stated herein, the court **grants** Defendants' Supplemental Motion for Summary Judgment regarding Plaintiffs' claims of invasion of privacy and racially motivated verbal harassment. The court **denies** Defendants' motion insofar as it relates to Plaintiffs' claims of an illegal strip search, as Plaintiffs have demonstrated or raised a genuine issue of material fact that Defendant Harris is not entitled to qualified immunity on this claim. The court also **denies** the motion insofar as it relates to the Group 2 Plaintiffs with respect to the unlawful detention claim, because these Plaintiffs have demonstrated or raised a genuine issue of material fact that Defendant Harris is not entitled to qualified immunity. The court **grants** the Defendants' motion on all of Karran Brown's claims. Plaintiffs' claims of invasion of privacy and verbal harassment based on race and the Group 1 Plaintiffs claims based on unlawful detention are dismissed with prejudice.

The matters remaining for the disposition are those claims on which summary judgment was denied by this opinion and Plaintiffs' claim for declaratory relief regarding Defendants' alleged violation of Article I, Section 9 of the Texas Constitution as stated in the court's order of November 12, 1998.