**Dawn M. COCHRANE, Plaintiff, Appellant,**

v.

**William QUATTROCCHI, et al., Defendants, Appellees.**

**No. 91–1493.**

United States Court of Appeals, First Circuit.

Heard Sept. 9, 1991.

Decided Nov. 15, 1991.

Vincent A. Indeglia with whom Law Offices of Vincent A. Indeglia and Edward J.

Romano, Providence, R.I., were on brief for plaintiff, appellant.

Michael B. Grant, Pawtucket, R.I., for defendants, appellees.

Before TORRUELLA, Circuit Judge, COFFIN, Senior Circuit Judge, and CYR, Circuit Judge.

CYR, Circuit Judge.

Appellant Dawn Cochrane brought an action for damages in the United States District Court for the District of Rhode Island asserting civil rights violations under 42 U.S.C. § 1983 and pendent state law claims for battery, intentional infliction of emotional distress, false imprisonment and assault, stemming from the strip search to which she was subjected before being permitted to visit her father in the Rhode Island Adult Corrections Institute ["ACI"]. The district court directed verdicts in favor of all defendant-appellees at the conclusion of appellant's case in chief. We vacate the district court judgment and remand for a new trial.

I

FACTS

Viewing the evidence and all fair inferences in the light most favorable to the nonmoving party, the jury could have found the following facts.[1] Appellant, the teenage daughter of ACI inmate Rickie A. Cochrane ("Cochrane"), has been a regular visitor at ACI since she was very young. She has never violated a prison visitation rule or presented any threat to institutional security. Cochrane, on the other hand, has spent most of his adult life in prison and admits to having used contraband drugs on ten to twenty occasions while incarcerated.

On arrival at ACI on June 10, 1989, appellant was informed that she would not be allowed to visit her father that day, or ever again, until she submitted to a strip search. Appellant was presented with a form containing a consent to search, which she signed. Two female correctional officers then led her into a bathroom, where she was told to remove her clothing. A correctional officer checked her hair and her ears. Appellant was instructed to squat, hold her head to her chest and cough, while two female correction officers stood behind her. No contraband was discovered and appellant was permitted to visit her father. Appellant was emotionally shaken by the experience.

During October 1988, inmate Cochrane had been found unconscious in his cell following an overdose of cocaine, which Cochrane told a police officer was supplied by appellee Deputy Quattrocchi or his son, a correctional officer at ACI. Upon learning that Cochrane had mentioned him and his son, appellee Quattrocchi became angry and warned Cochrane, "I'm going to get you for that."

The district court first ruled that appellant had no constitutional right to visit her father in prison. The court then concluded that there could be no fourth amendment violation, since appellant had consented to the strip search and the search was reasonable in scope. The court directed the challenged verdicts before the defendants presented their case.

II

DISCUSSION

█ Like every other circuit that has considered the question, see *Thorne v. Jones*, 765 F.2d 1270, 1276 (5th Cir.1985); *Daugherty v. Campbell*, 935 F.2d 780, 787

---

1. On a motion for directed verdict under Federal Rule of Civil Procedure 50(a), the trial court must view the evidence, and draw all fair inferences, in the light most favorable to the party against whom the motion for directed verdict is made. *See Dehydrating Process Co. v. A.O. Smith Corp.*, 292 F.2d 653, 656 n. 6 (1st Cir.), *cert. denied*, 368 U.S. 931, 82 S.Ct. 368, 7 L.Ed.2d 194 (1961). *See generally* 5A *Moore's Federal Practice* ¶ 50.02[1] n. 20 (2d ed. 1966). We in turn are required to view the evidence in the same favorable light and to accord the nonmovant "the benefit of all inferences which the evidence fairly supports, even though contrary inferences might reasonably be drawn." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962). *See also Roche v. New Hampshire Nat'l Bank*, 192 F.2d 203, 205 (1st Cir.1951). *See generally* 5A *Moore's* ¶ 50.02[1] n. 21.

(6th Cir.1991); *Smothers v. Gibson,* 778 F.2d 470, 473 (8th Cir.1985), we have held that a prison visitor retains a fourth amendment right to be free from unreasonable searches and seizures, *Blackburn v. Snow,* 771 F.2d 556, 563 (1st Cir.1985). Reasonableness, of course, " 'depends on the context within which a search takes place.' " *Id.* at 563 (quoting *New Jersey v. T.L.O.,* 469 U.S. 325, 337, 105 S.Ct. 733, 740, 83 L.Ed.2d 720 (1985)). "[I]n deciding to what standard of reasonableness prison officials strip searching visitors should be held, we must balance the official interest in maintaining security against the intrusion entailed by a strip search[,]" *id.* at 564, bearing in mind both that "the preservation of internal security 'is "central to all other corrections goals," ' " *id.* at 562 (quoting *Hudson v. Palmer,* 468 U.S. 517, 528, 104 S.Ct. 3194, 3201, 82 L.Ed.2d 393 (1984) (quoting *Pell v. Procunier,* 417 U.S. 817, 823, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974))), and that prison visitors possess a "diminished expectation of privacy," *id.* at 564; *see also id.* at 563 ("those visiting a prison cannot credibly claim to carry with them the full panoply of rights they normally enjoy").

■ On the other hand, we recognize that "a strip search, by its very nature, constitutes an extreme intrusion upon personal privacy, as well as an offense to the dignity of the individual...." *Burns v. Loranger,* 907 F.2d 233, 235 n. 6 (1st Cir. 1990); *see also Arruda v. Fair,* 710 F.2d 886, 887 (1st Cir.1983) (recognizing the "severe if not gross interference with a person's privacy that occurs when guards conduct a visual inspection of body cavities"); *Hunter v. Auger,* 672 F.2d 668, 674 (8th Cir.1982) ("a strip search, regardless how professionally and courteously conducted, is an embarrassing and humiliating experience"). These latter considerations have prompted us to hold that some as-yet undefined "level of *individualized* suspicion" is

necessary before a strip search of a prison visitor can be reconciled with the requirements of the fourth amendment. *Blackburn,* 771 F.2d at 567 (emphasis added).[2]

■ Appellees contend that the strip search was reasonable, as it was based both on information from a reliable informant and on the uncontroverted evidence of Cochrane's repeated drug use while incarcerated. The view we are required to take of the evidence, *see supra* note 1, precludes either contention on the present record. *See also De Leon Lopez v. Corporacion Insular De Seguros,* 931 F.2d 116, 123 (1st Cir.1991) (court must " 'examine the evidence and the inferences reasonably to be drawn therefrom in the light most favorable to the nonmovant' in order to see if 'reasonable persons could reach but one conclusion' ") (quoting *Wagenmann v. Adams,* 829 F.2d 196, 200 (1st Cir.1987)).

Appellant argues that two factors undermine the validity of the strip search: (1) it was done in retaliation for Cochrane's allegations against appellee Quattrocchi (2) there were insufficient indicia of reliability surrounding the evidence that appellant had, in the past, brought drugs into the correctional facility. On this record we conclude that a reasonable person, crediting Cochrane's testimony, as we are presently required to do, could have found that the strip search was conducted in retaliation for Cochrane's allegations—whether made seriously or sardonically—[3]that Quattrocchi or his son supplied the cocaine used by Cochrane in October, 1988. Moreover, absent any evidence that appellant ever violated a prison visitation rule, or ever supplied Cochrane with drugs, a reasonable juror could have concluded that Cochrane's contraband drugs were supplied by prison officials or other inmates. Thus, the jury could have found that the strip search of appellant was unreasonable because it was based on *no* "individualized suspicion." *Blackburn,* 771 F.2d at 567; *see also*

---

2. Appellees neither assert, nor have they yet evidenced, "highly unusual circumstances" such as might remove the case from the holding in *Blackburn. See Blackburn,* 771 F.2d at 567.

3. The record suggests that Cochrane's allegation regarding Quattrocchi's role in his cocaine overdose may have been flippant, a sarcastic response to a police officer's "insult[ing]" suggestion that Cochrane "was going to tell him anything."

*Hunter,* 672 F.2d at 675 ("reasonable suspicion standard ... requires individualized suspicion, specifically directed to the person who is targeted for the strip search"); *Thorne,* 765 F.2d at 1277 " ' "reasonable suspicion" must be specifically directed to the person to be searched' " (quoting *United States v. Afanador,* 567 F.2d 1325, 1331 (5th Cir.1978)).

Our conclusion finds further support in Quattrocchi's testimony as to the reliability of his confidential informant. On direct examination, Quattrocchi admitted that until the morning of the trial, he had been unable to remember the name of the informant who told him that Dawn Cochrane had been carrying drugs to her father. Thereafter, he vouched for the reliability of the informant in only the most general terms, stating in formulaic fashion that the inmate was "a reliable informant, who had proved reliable in the past."

Only much later, ironically on cross-examination by appellant's lawyer, was there any approach to specificity. Even then, the indicia of reliability were meager. Quattrocchi was unable to recall the date when he began to use the informant, and was unwilling to specify the time period during which the information was supplied, or to describe the information received in any detail, stating only that "whenever [the informant] did give me information, it was reliable." With considerable prodding by appellant's counsel, Quattrocchi eventually testified that the informant had, over roughly a six month period, provided reliable information regarding the introduction of narcotics and weapons into the correctional facility.

While this evidence, standing alone, might be viewed as sufficient to justify the strip search of appellant, it is fragile enough to be overcome by a finding that a retaliatory motive, rather than "individualized suspicion," was the real basis for the search.

Since it is the province of the jury to judge witness credibility, *see, e.g., United States v. Seeley,* 892 F.2d 1, 4 (1st Cir. 1989), and it is for the jury to determine the reasonableness of a search in a section 1983 action, *Keeler v. Hewitt,* 697 F.2d 8, 12 (1st Cir.1982) ("the 'reasonableness' of the defendants' conduct was a question of fact for the jury to determine from the totality of a number of specific and, in many instances, disputed facts"), the motion for directed verdict submitted at the conclusion of appellant's case in chief should have been denied.

■ The district court ruling that appellant's execution of the consent form mooted any question as to whether there was a reasonable basis for the strip search runs counter to our decision in *Blackburn, supra.* There we considered whether a prison visitor who had provided written consents to successive strip searches had waived any fourth amendment claim.[4] The *Blackburn* panel decided, as a matter of law, *Blackburn,* 771 F.2d at 567, that a prison visitor confronted with the choice between submitting to a strip search or foregoing a visit cannot provide a "legally cognizable consent," *id.* at 569. Pretermitting the question whether a visitor possessed a constitutional right, or merely a privilege, to visit the prison, *Blackburn* concluded that conditioning "access to the Jail upon sacrifice of [the visitor's] right to be free of an otherwise unreasonable strip search" was "dispositive of the consent issue." *Id.* at 568. *Blackburn* rejected the argument that the visitor's right to leave rather than submit to search, or to decline to return after the first strip search, in any way affected the issue; "for it is the *very choice to which she was put* that is constitutionally intolerable...." *id.* (emphasis in original); *see also Thorne,* 765 F.2d at 1276 (consent does not render a groundless strip search reasonable); *Daugherty,* 935 F.2d 780 (same). Given that appellant in the instant case was confronted with a similar, and no less "constitutionally intolerable," choice between being denied prison visitation access indefinitely or waiving her

---

**4.** Unlike the present case, *Blackburn* involved a uniform jail policy requiring strip searches of all visitors. *Blackburn,* 771 F.2d at 559.

constitutional right to be free from unreasonable search, *Blackburn* requires the conclusion that appellant gave no "legally cognizable consent." The directed verdicts must be vacated.

*The district court judgment is vacated and the case is remanded for a new trial. Costs are awarded to appellant.*