# United States Court of Appeals

## For the First Circuit

No. 02-1568

ANGELA SAVARD, ET AL.,

Plaintiffs, Appellants,

v.

STATE OF RHODE ISLAND, ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND
[Hon. Mary M. Lisi, U.S. District Judge]

Before

Boudin, Chief Judge,

Coffin and Bownes, Senior Circuit Judges,

Torruella, Selya, Lynch, Lipez and Howard, Circuit Judges.

Gregory A. Belzley, with whom Dinsmore & Shohl LLP and Thomas
W. Kelly were on brief, for appellants.
Rebecca Tedford Partington, Deputy Chief, Civil Division, with
whom Patrick C. Lynch, Attorney General, was on brief, for
appellees.

JUDGMENT AND
OPINIONS EN BANC

August 4, 2003

This appeal having been considered by the court en banc, the judgment of the district court is affirmed by an equally divided court. The opinions that follow reflect the views of the participating judges.

**— Opinions Follow —**

By the Court

_____/s/_____
Richard C. Donovan, Clerk

**SELYA**, **Circuit Judge** **(with whom BOUDIN**, **Chief Judge**, **and LYNCH and HOWARD**, **Circuit Judges**, **join).** The plaintiffs, all of whom were arrested in Rhode Island for non-violent, non-drug-related misdemeanors, were subjected to unconstitutional searches of their persons incident to their detention at the Adult Correctional Institutions (the ACI). These searches, conducted pursuant to a longstanding institutional policy, encompassed both strip searches (i.e., visual inspections of the naked body) and visual body cavity searches (i.e., inspections of the anal and genital areas).[1] After the courts struck down the strip search policy, the plaintiffs sued the State of Rhode Island and a number of prison officials for damages sustained as a result of the illegal intrusions.

The plaintiffs' suit invoked 42 U.S.C. § 1983 (2000). Because the State is immune from suits for damages under section 1983, see Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989); Johnson v. Rodriguez, 943 F.2d 104, 108-09 (1st Cir. 1991), the controversy before us focuses on the liability vel non of the individual defendants. After some preliminary skirmishing, the district court entered summary judgment in favor of those defendants on the basis of qualified immunity. A panel of this court reversed that ruling, but the full court subsequently granted

---

[1]For ease in reference, we sometimes use the shorthand term "strip search" to describe both practices.

-3-

rehearing en banc and (as is customary in such instances) ordered the panel opinion withdrawn. The court now divides equally and thus affirms the district court's ruling. The judges who subscribe to this opinion believe that affirmance is fully warranted: upon a broad review of the preexisting law and its application to the unusual situation at the ACI, we conclude that, when the underlying events occurred, prudent prison officials reasonably could have believed that Rhode Island's strip search policy was constitutional.

I. BACKGROUND

In reviewing a grant of summary judgment, we rehearse the facts in the light most sympathetic to the non-moving parties (here, the plaintiffs), indulging all reasonable inferences in their favor. See, e.g., Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000). Here, however, that praxis has little bearing, for the facts upon which our decision turns are largely undisputed.

Unlike other states, Rhode Island has no regional or county detention facilities. It operates only a single, all-purpose penitentiary: the ACI. Centrally located in Cranston, Rhode Island, the ACI comprises seven separate maximum security facilities. Two of those units — one for women and the other for men — receive all persons committed to the custody of the Department of Corrections regardless of the nature of their offenses. At the times material hereto, these intake facilities

-4-

housed an array of prisoners ranging from newly sentenced felons to convicts under protective custody to pretrial detainees to arrestees. All of these individuals, except for detainees held in protective custody, were commingled while in various parts of the intake facilities. Detainees held in protective custody used the same areas as other inmates but at different times.

During the currency of this arrangement, Rhode Island maintained written policies that required all new entrants into the ACI, including misdemeanant arrestees, to undergo strip and body cavity searches. In 1999, Craig Roberts ran afoul of this policy. Local police, having made a routine stop of a motor vehicle in which Roberts was a passenger, learned that the Rhode Island Family Court had issued a body attachment — the functional equivalent of a writ of arrest — addressed to him. Although Roberts protested that the body attachment had been withdrawn and produced what purported to be documentation to that effect, the police detained him.

In accordance with the customary procedure, the police transported Roberts to the ACI. Upon his admission, he was twice subjected to strip and body cavity searches. These searches uncovered no drugs, weapons, or other contraband. Shortly thereafter, a sheriff verified that the body attachment had been withdrawn. Roberts was released.

Roberts was gone but not forgotten. He brought suit in the federal district court alleging that the strip searches had violated his constitutional rights. Upon cross-motions for summary judgment, the district court ruled that the strip searches had offended Roberts's rights under the Fourth Amendment and enjoined the State from continuing to enforce the written policies then in effect. Roberts v. Rhode Island, 175 F. Supp. 2d 176, 183 (D.R.I. 2000) (Roberts I). We affirmed. Roberts v. Rhode Island, 239 F.3d 107, 113 (1st Cir. 2001) (Roberts II).

Rhode Island abandoned the proscribed policy from and after the date of the district court's decision (March 17, 2000). Thereafter, eighteen plaintiffs — all of whom had been arrested for non-violent, non-drug-related misdemeanors and subjected to strip and body cavity searches prior to that date — brought a new action in the federal district court on behalf of themselves and all others similarly situated. In their class-action complaint, the plaintiffs alleged that the searches violated their constitutional rights and sought money damages.

The suit named as defendants the State and a galaxy of prison officials. Upon the defendants' motion, the district court dismissed Roberts's claim for damages based on the doctrine of res judicata. See, e.g., Allen v. McCurry, 449 U.S. 90, 94 (1980) (stating that res judicata precludes a plaintiff from relitigating issues that were or could have been raised in an earlier action

against the same defendant prescinding from the same set of operative facts); Kale v. Combined Ins. Co., 924 F.2d 1161, 1165-66 (1st Cir. 1991) (same). The court thereafter entered summary judgment against the remaining plaintiffs. The court reasoned that, prior to the decision in Roberts I, it was not clearly established that prison officials needed some particularized suspicion before strip-searching misdemeanant arrestees who were about to be introduced into the general population at a maximum security prison (and, therefore, that the defendants enjoyed the protection of qualified immunity). This appeal followed.

## II. ANALYSIS

We review orders granting summary judgment de novo. Plumley v. S. Container, Inc., 303 F.3d 364, 369 (1st Cir. 2002). Where, as here, a party's entitlement to summary judgment hinges on a claim of qualified immunity, we must balance the need to vindicate constitutional rights against the need to insulate public officials from civil litigation that might unduly inhibit the assiduous discharge of their duties. See Anderson v. Creighton, 483 U.S. 635, 638 (1987). In balancing those competing needs, we employ a three-part algorithm. Suboh v. Dist. Att'y's Office, 298 F.3d 81, 90 (1st Cir. 2002); Hatch v. Dep't for Children, Youth and Their Families, 274 F.3d 12, 20 (1st Cir. 2001). The threshold question is whether the plaintiffs have established a constitutional violation. Hope v. Pelzer, 536 U.S. 730, 736

-7-

(2002); Saucier v. Katz, 533 U.S. 194, 201 (2001). The second question deals with fair warning; it asks whether the law was clearly established at the time of the constitutional violation. Hope, 536 U.S. at 739-41; Anderson, 483 U.S. at 638-40. The final question is whether a reasonable official, situated similarly to the defendant(s), would have understood that the conduct at issue contravened the clearly established law. Saucier, 533 U.S. at 202.

In this case, the first part of the algorithm need not detain us. We acknowledge that strip searches are intrusive and degrading (and, therefore, should not be unreservedly available to law enforcement officers). The Roberts decisions exemplify this thinking; they hold unequivocally that the ACI's policy of strip-searching persons arrested for non-violent, non-drug-related misdemeanors, in the absence of particularized suspicion, violated the Constitution. See Roberts II, 239 F.3d at 113; Roberts I, 175 F. Supp. 2d at 183. The questions on which this appeal turns, therefore, involve the second and third branches of the qualified immunity algorithm. We must determine whether the law was clearly established, prior to March 17, 2000, to the effect that prison officials need at least reasonable suspicion before subjecting misdemeanant arrestees to strip searches when introducing them into the general population of a maximum security prison, and whether a reasonable prison official, situated similarly to the defendants,

would have understood at that time that the policy in place at the ACI transgressed the Constitution.

Although the bases for these determinations often overlap, the instant plaintiffs cannot prevail unless we determine both questions favorably to them. Thus, we begin our analysis with an examination of whether the law can be said to have been "clearly established" at or before the critical time (March 17, 2000).[2] The degree to which the law was clearly established as of a particular date is a matter for the court to determine. Elder v. Holloway, 510 U.S. 510, 516 (1994); Siegert v. Gilley, 500 U.S. 226, 232 (1991); Diaz v. Martinez, 112 F.3d 1, 3 (1st Cir. 1997).

The fundamental justification for the qualified immunity defense is that public officials performing discretionary functions should be free to act without fear of punitive litigation except when they fairly can anticipate that their conduct will give rise to liability for damages. Davis v. Scherer, 468 U.S. 183, 195 (1984). That anticipation depends, in large part, on the extent to which legal rules are clearly established. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The standard is an objective one. Anderson, 483 U.S. at 639; Iacobucci v. Boulter, 193 F.3d 14, 21 (1st Cir. 1999). It follows, then, that an inquiry into the reasonableness of an officer's conduct must focus on the

---

[2]Because we answer this question in the negative, see text infra, we need not address the final prong of the qualified immunity algorithm.

discernible contours of the law at the time of the alleged act or omission.  <u>Hatch</u>, 274 F.3d at 22-23.

To attain the necessary perspective, an inquiring court must look back in time and conduct the juridical equivalent of an archeological dig.  The court must canvass controlling authority in its own jurisdiction and, if none exists, attempt to fathom whether there is a consensus of persuasive authority elsewhere.  <u>See</u> <u>Wilson</u> v. <u>Layne</u>, 526 U.S. 603, 617 (1999); <u>Brady</u> v. <u>Dill</u>, 187 F.3d 104, 116 (1st Cir. 1999).

This exploration is not limited to cases directly on point.  Because "officials can still be on notice that their conduct violates established law even in novel factual circumstances," <u>Hope</u>, 536 U.S. at 741, overcoming a qualified immunity defense does not require a plaintiff to show that either the particular conduct complained of or some materially indistinguishable conduct has previously been found unlawful.  <u>See</u> <u>United States</u> v. <u>Lanier</u>, 520 U.S. 259, 268-71 (1997); <u>Mitchell</u> v. <u>Forsyth</u>, 472 U.S. 511, 535 n.12 (1985).  Still, the relevant legal rights and obligations must be particularized enough that a reasonable official can be expected to extrapolate from them and conclude that a certain course of conduct will violate the law. <u>Saucier</u>, 533 U.S. at 201-02.  Consequently, if the operative legal principles are clearly established only at a level of generality so high that officials cannot fairly anticipate the legal consequences

of specific actions, then the requisite notice is lacking. The bottom line is that the qualified immunity defense prevails unless the unlawfulness of the challenged conduct is "apparent." Anderson, 483 U.S. at 640.

Against this backdrop, we turn to the degree of clarity in the law relevant to this case. In conducting our appraisal, we have endeavored to take into account all the decisional law, in and out of our own circuit, that was on the books at the time of the events in question. See Lanier, 520 U.S. at 268-69; Hatch, 274 F.3d at 23.

At the margins, the lines are easily plotted. On the one hand, courts long have viewed blanket strip searches as extreme intrusions upon Fourth Amendment rights. See, e.g., Bell v. Wolfish, 441 U.S. 520, 558 (1979); Mary Beth G. v. City of Chicago, 723 F.2d 1263, 1272 (7th Cir. 1983). On the other hand, security is a paramount concern in prison environments, and courts long have recognized that unpleasantly intrusive security measures, up to and including blanket strip searches, may be proper in such settings. See Bell, 441 U.S. at 560-62; Bonitz v. Fair, 804 F.2d 164, 170 (1st Cir. 1986). The constitutional line that separates permissible from impermissible uses of these methods is imprecise and context-specific. In the last analysis, plotting that line requires a determination of what is reasonable under a given set of

circumstances. <u>Bell</u>, 441 U.S. at 559; <u>United States</u> v. <u>Chamorro</u>, 687 F.2d 1, 5 (1st Cir. 1982).

The difficulty, of course, is that this formulation, while legally respectable, does not go very far toward curing the imprecision with which decisionmakers must grapple. This is inevitable — or nearly so — given the subject matter. In the best of circumstances, "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." <u>Bell</u>, 441 U.S. at 559. Indeed, the Supreme Court itself has acknowledged, in a qualified immunity case, "the difficulty of determining whether particular searches or seizures comport with the Fourth Amendment." <u>Anderson</u>, 483 U.S. at 644. And that difficulty is compounded where, as here, the determination involves gauging whether a serious intrusion is reasonable in an incarcerative environment. <u>See</u> <u>Swain</u> v. <u>Spinney</u>, 117 F.3d 1, 9 (1st Cir. 1997).

With these basic tenets in mind, we examine the two First Circuit decisions that bear most closely on this case. Neither comparison is very exact.

We start with <u>Swain</u>. There, police arrested a woman on suspicion of narcotics possession and temporarily held her in a jail cell by herself. <u>Id.</u> at 8. The officers, following institutional practice, strip-searched her. <u>Id.</u> at 4-5. We declared the strip search unconstitutional, holding that strip-

searching an arrestee ordinarily requires at least reasonable suspicion that the person arrested is concealing contraband or weapons. Id. at 7. We pointed out that, in Swain's case, there was no basis for any such suspicion. Id. at 8-9. Moreover, she was being held in virtual isolation, so there was no risk that she would come in contact with other prisoners (and, thus, succeed in smuggling contraband or weapons into the jail). Id. at 8.

The plaintiffs contend that Swain clearly established the law relevant to this case. It is, however, an oversimplification to say that, because we applied the reasonable suspicion standard to strip searches in a particular custodial context, the handwriting was on the wall that the same standard would apply to the ACI as well. There are important differences between detaining an arrestee in virtual isolation and introducing an arrestee into the general population of a maximum security prison.

Making this point brings us to our second case — a decision that the defendants insist has decretory significance here. That case is Arruda v. Fair, 710 F.2d 886 (1st Cir. 1983) (Breyer, J.). There, we upheld a blanket strip search policy with regard to prison inmates. Id. at 888. We reasoned that because the searches involved the most dangerous of prisoners as they departed from, and entered into, a particularly sensitive area of a maximum security prison, security concerns provided a compelling justification for the institution's policy. Id. at 887-88.

-13-

As in <u>Arruda</u>, the defendants in this case attempt to justify their blanket strip search policy as a necessary (or, at least, reasonable) means of ensuring institutional security. They maintain that the unique nature of the ACI's intake facilities, in which arrestees are intermingled with maximum security prisoners, raises concerns similar to those raised in <u>Arruda</u> and warrants the implementation of such a policy. This argument has considerable force, for <u>Arruda</u> reasonably can be read as saying that the risk that any prisoner in a maximum security facility might receive weapons or contraband from visitors, renegade guards, or others is enough to justify a blanket strip search policy. But despite its broad language, <u>Arruda</u> involved strip searches of convicted felons, not misdemeanant arrestees — and that disparity cannot idly be brushed aside.

In the end, we recognize that both <u>Swain</u> and <u>Arruda</u> offer valuable insights, but that neither is a very exact match. While <u>Swain</u> makes clear that strip searches ought not lightly to be indulged, the factual context of the case presented rather minimal security concerns. And while <u>Arruda</u> makes clear that institutional security needs may require intrusive measures in a maximum security setting, that case dealt not with persons arrested for relatively innocuous misdemeanors, but, rather, with hardened criminals. So long as the facts in these cases are distinguishable in a fair way from the facts at hand — and we believe that they are — then

neither of them can be said to have clearly established the law for purposes of a qualified immunity determination in the instant case. See Saucier, 533 U.S. at 202-03.

We recognized much the same point in Roberts II, 239 F.3d at 111 (noting that "[t]he institutional security concerns in play here fall somewhere between those exhibited in Swain, which were insufficient to support a search, and those in Arruda and Bell, which made broad-based searches without individual suspicion reasonable"). To be sure, we ultimately placed the case "on the Swain side of the constitutional line." Id. But our acknowledgment that the ACI's strip search policy fell into the gray area between Swain and Arruda carries more weight for present purposes than our actual holding. A holding on the merits is not dispositive on the issue of qualified immunity. See Cookish v. Powell, 945 F.2d 441, 443 (1st Cir. 1991); Morales v. Ramirez, 906 F.2d 784, 787 (1st Cir. 1990). The law does not expect a public official, faced with the need to make an objectively reasonable real-world judgment, to anticipate precisely the legal conclusions that will be reached by a panel of federal appellate judges after briefing, arguments, and full-fledged review. See Wilson, 526 U.S. at 617.

The plaintiffs, ably represented, go beyond Swain and Arruda in an effort to convince us that reasonable correctional officials should have realized the unconstitutionality of the ACI's

-15-

strip search policy prior to March 17, 2000. They point to a line of cases stating that blanket strip searches of misdemeanant arrestees, conducted without particularized suspicion, are unconstitutional. See, e.g., Masters v. Crouch, 872 F.2d 1248, 1255 (6th Cir. 1989); Weber v. Dell, 804 F.2d 796, 804 (2d Cir. 1986); Stewart v. Lubbock County, 767 F.2d 153, 156-57 (5th Cir. 1985); Giles v. Ackerman, 746 F.2d 614, 618-19 (9th Cir. 1984); Hill v. Bogans, 735 F.2d 391, 394-95 (10th Cir. 1984). These cases come as no surprise; we cited many of them in Roberts II, 239 F.3d at 111-13. For qualified immunity purposes, however, there are important distinctions between these cases and the case at hand.

In the first place, all the cases upon which the plaintiffs rely deal with detentions in local jails and police stations. In contrast, the case before us involves detentions in a maximum security prison. This distinction is quite meaningful: the case law emphasizes that prison regulations may constitutionally impinge upon fundamental rights so long as such regulations are reasonably related to legitimate penological interests. See, e.g., Overton v. Bazzetta, 123 S. Ct. 2162, 2167 (2003); Turner v. Safley, 482 U.S. 78, 87 (1987). Within the walls of a maximum security prison, the need to preserve internal security is compelling. Hudson v. Palmer, 468 U.S. 517, 526-27 (1984); Wood v. Clemons, 89 F.3d 922, 928 (1st Cir. 1996). We think it follows that Rhode Island correctional officials

-16-

reasonably could have regarded the stark differences between local lockups and maximum security prisons as pivotal in deciding whether a particular security-oriented policy was necessary. We explain briefly.

The population of a maximum security prison tends to be much more volatile and much less transient than that of a county jail. See Shain v. Ellison, 273 F.3d 56, 65 (2d Cir. 2001). Thus, it is fairly debatable whether inmates in such a facility may be likely to arrange for an outsider to bring them weapons or other contraband by being arrested for a minor offense. Compare, e.g., Watt v. City of Richardson Police Dep't, 849 F.2d 195, 198 (5th Cir. 1988) (declaring that "a suspect jailed even temporarily on a minor offense could have the opportunity, if not searched, to smuggle in weapons or contraband," so that strip-searching such suspects "is not an irrational attempt to foster . . . security"), with, e.g., Walsh v. Franco, 849 F.2d 66, 69 (2d Cir. 1988) (declaring that "the risk of a misdemeanor arrestee's introducing contraband into the general jail population simply d[oes] not warrant a strip search of all arrestees"). The debatable nature of the question argues in favor of qualified immunity. See Goyco de Maldonado v. Rivera, 849 F.2d 683, 688 (1st Cir. 1988) (stating that an official "need show no more than that [the question is close] to prevail on his qualified immunity defense"); Vazquez Rios v. Hernandez Colon, 819 F.2d 319, 328 (1st Cir. 1987) (noting that

"the closeness of the call suggests that [the law] could not have been 'clearly established'").

The cases upon which the plaintiffs rely are distinguishable in yet another salient respect. Those cases do not gainsay that the security concerns arising out of the intermingling of inmates are a significant counterweight in the balance that must be struck between personal rights and practical necessities. Read for all they are worth, the plaintiffs' cases at most deny that this counterweight is a sufficient justification in particular circumstances (invariably, circumstances attending an arrestee's detention at facilities such as jails and police stations). See, e.g., Masters, 872 F.2d at 1255; Hill, 735 F.2d at 394; Logan v. Shealy, 660 F.2d 1007, 1013 (4th Cir. 1981). Given the unique features of the ACI's intake facilities, the composition of the inmate population, and the fact that the misdemeanant arrestees generally were not searched prior to their arrival at the ACI, it was hardly unreasonable for Rhode Island correctional officials to calibrate the balance differently.

In point of fact, a separate line of cases has emphasized the need to defer to the judgment of correctional officials in addressing institutional security needs. See, e.g., Overton, 123 S. Ct. at 2167; Procunier v. Martinez, 416 U.S. 396, 404-05 (1974); Hay v. Waldron, 834 F.2d 481, 486 (5th Cir. 1987); see also Bell, 441 U.S. at 547-48. After all, institutional security is "perhaps

the most legitimate of all penological goals." <u>Overton</u>, 123 S. Ct. at 2168; <u>accord</u> <u>Pell</u> v. <u>Procunier</u>, 417 U.S. 817, 823 (1974).

In an opinion that is closer to this case than any other, the Second Circuit upheld a policy in which a prison facility conducted random strip searches of all inmates, including pretrial detainees. <u>See</u> <u>Covino</u> v. <u>Patrissi</u>, 967 F.2d 73, 80 (2d Cir. 1992). Adverting, among other things, to the fact that the plaintiff (a pretrial detainee) commingled with sentenced inmates who had histories of violence and substance abuse, the court concluded that the prison's policy was a reasonable response to the officials' concerns.[3] <u>Id.</u> at 78-79.

The short of the matter is that, throughout the last quarter of the twentieth century, courts had pursued two divergent lines of precedent. This case, as we said in <u>Roberts II</u>, 239 F.3d at 111, fell along neither axis, but, rather, into the tenebrous middle. We are mindful that there is a distinction for qualified immunity purposes between an unconstitutional but objectively reasonable act and a blatantly unconstitutional act. <u>Saucier</u>, 533 U.S. at 206; <u>Anderson</u>, 483 U.S. at 641. Here, the lack of any direct precedent and the undulating contours of the law during the relevant period combine to persuade us that the constitutional

---

[3]Of course, the plaintiff there had been arrested for an offense more serious than those attributed to the plaintiffs in this case. <u>Covino</u>, 967 F.2d at 75 n.1. The Second Circuit did not base its decision on this distinction, however, nor did it limit its holding to blanket strip searches of "major" offenders.

violation was not obvious; the defendants reasonably could have thought, prior to Roberts I, that there was room in the law for the ACI's strip search policy.

The plaintiffs pose one last challenge to the assertion of a qualified immunity defense. They note that, rather than strip-searching all arrestees, officials at the ACI could have employed less extreme measures such as conducting pat-down searches or segregating misdemeanant arrestees from the rest of the prison population. In support of this view, they point to our conclusion that the search policy was almost entirely unnecessary to control the entry of contraband into the ACI. See Roberts II, 239 F.3d at 112. But this too involves a judgment call. In the relevant time frame, some cases indicated that blanket strip searches are never constitutional when the security needs they address could be met by less intrusive means. E.g., Giles, 746 F.2d at 617; Sostre v. Preiser, 519 F.2d 763, 764 (2d Cir. 1975). Other cases suggested that the availability of less intrusive means is irrelevant to the analysis so long as officials reasonably could have concluded that such measures were more burdensome and less efficacious than blanket strip searches. See, e.g., Bell, 441 U.S. at 559 n.40; Hay, 834 F.2d at 485; Blackburn v. Snow, 771 F.2d 556, 566 (1st Cir. 1985); see also Turner, 482 U.S. at 90-91 (emphasizing that "prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's

constitutional complaint").[4]  Given this split in authority, we find that the law on this matter was also not clearly established. Therefore, the defendants reasonably could have believed (until the federal court declared Rhode Island's blanket strip search policy unconstitutional) that they were under no legal obligation to resort to alternative measures.

Our brethren suggest that we require an exact match with the facts of previously decided cases before we will deny a defendant the shield of qualified immunity.  That is simply not so. What is so is that "[t]he meaning of reasonableness [of a search] for Fourth Amendment purposes is highly situational" and requires "a balancing of the need to search against the invasion which the search entails."  Wood, 89 F.3d at 928 (citations and internal quotation marks omitted).  The cases that our brethren cite in an effort to show that reasonable suspicion was clearly established as a condition precedent to a strip search of a person in custody are no more on point than the cases, cited above, that authorize various exceptions to that generality.  Given this cacophony of voices, a reasonable prison official, faced with the novel factual situation that confronted those who were in charge of the ACI, had no way of knowing which voice should guide him in drawing the

---

[4]Indeed, the Bell Court suggested that the lack of a history of discovered contraband on inmates' bodies might attest to the effectiveness of this search modality as a deterrent.  Bell, 441 U.S. at 559.

Fourth Amendment balance. It is the absence of clear guidance, not the absence of a perfect precedential match, that makes qualified immunity appropriate here.

In this regard, our colleagues reprove us for attributing significant weight both to the dangers inherent in commingling violent felons with misdemeanant arrestees and to distinctions between jails and maximum security prisons. We plead guilty to that charge. But we attach weight to those factors because of our respect for those who must maintain institutional security in the most difficult of settings. Correctional officials charged with the operation of maximum security prisons have an unenviable task — and courts should be reluctant casually to impose on them personal liability for damages in the absence of "standards sufficiently clear and simple to be applied with a fair prospect of surviving judicial second-guessing months and years [later]." Atwater v. City of Lago Vista, 532 U.S. 318, 349 (2001).

To sum up, the district court mortally wounded the ACI's blanket strip search policy in Roberts I, and we administered the last rites in Roberts II. That policy is now dead and buried. While we have found the defendants' resolution of the Fourth Amendment balance incorrect, see Roberts II, 239 F.3d at 112-13, we conclude that, given the mixed signals sent by the case law, the difficulties inherent in Fourth Amendment balancing in the prison context, the special features of the ACI, and the wide berth called

for by the qualified immunity doctrine, the defendants, prior to March 17, 2000, reasonably could have believed the ACI's policy to be both justified and constitutional. Put another way, the defendants did not have fair warning, prior to March 17, 2000, that their conduct was unlawful. If judges can span the spectrum on this sort of constitutional question, it would certainly be unfair to hold the defendants liable for doing nothing more blameworthy than guessing incorrectly about how the courts ultimately would resolve the issue. See Wilson, 526 U.S. at 618.

## III. CONCLUSION

We need go no further. This is a close case, but we do not require public officials to foretell the course of constitutional law with absolute accuracy in order to obtain the balm of qualified immunity. Id. at 617. To the contrary, the doctrine of qualified immunity is designed to protect "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). Concluding, as we do, that the law as it existed when the events at issue occurred did not clearly establish that the ACI's policy authorizing blanket strip and body cavity searches violated the plaintiffs' Fourth Amendment rights, we would uphold the entry of summary judgment in the defendants' favor on the basis of qualified immunity.


**— Separate Opinion Follows —**

**BOWNES**, **Senior Circuit Judge**, with whom **COFFIN**, **Senior Circuit Judge**, **TORRUELLA**, **Circuit Judge**, and **LIPEZ**, **Circuit Judge**, **join**. The defendants in this case were granted qualified immunity because, according to the district court, the law did not "clearly establish" that reasonable suspicion was needed to strip search people arrested for non-violent, non-drug related minor offenses. Our four respected colleagues agree with this analysis. We do not. The opinion of our colleagues is wrong on the law, the logic that they adopt is at odds with recent Supreme Court precedent regarding qualified immunity, and we believe their reasoning will put constitutional rights at risk.

It is important to keep in mind what we are dealing with in this case. The strip searches conducted here are "perhaps 'the greatest personal indignity' searching officials can visit upon an individual." Blackburn v. Snow, 771 F.2d 556, 564 (1st Cir. 1985) (quoting Bell v. Wolfish, 441 U.S. 520, 594 (1979)). According to Rhode Island's written policies, these searches included a "visual examination of [the] groin and rectum." Male arrestees were required to "lift their penises and testicles on the officer's command to provide a clear view of the groin area." Both male and female arrestees were required "to bend over and spread the rectum to provide a clear view of the area." Moreover, these searches were conducted against harmless individuals. All of the plaintiffs in this case were arrested for non-violent, non-drug related minor

-24-

offenses.  By way of example, one of the plaintiffs, George Barber, loaned his car to his son in 1993 and the son received a traffic ticket that was never paid.  Six years later, Barber was arrested because of the unpaid ticket, held at the Adult Correctional Institutions ("the ACI") overnight and strip searched twice. Another plaintiff, Stephanie Clark, called police for assistance after an auto accident and was arrested because a computer check showed an outstanding arrest warrant for her failure to appear at a probation review.  Clark had already finished her probation and the warrant was issued in error.  She was taken to the ACI and strip searched twice.

With these facts in mind, we turn to the legal issues in this case.  We begin with whether it was the "clearly established" law in this circuit, as of March 17, 2000, that prison officials needed reasonable suspicion to strip search non-violent, non-drug related minor offense arrestees.[5]  "One tried and true way of determining whether [a] right was clearly established . . . is to

_____

[5]We note at the outset that the reasonable suspicion standard is not particularly demanding.  Reasonable suspicion is "something stronger than a mere hunch, but something weaker than probable cause."  Wood v. Clemons, 89 F.3d 922, 929 (1st Cir. 1996) (citation and quotation marks omitted).  It is a standard that can be satisfied by a wide range of circumstances, including "the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest."  Weber v. Dell, 804 F.2d 796, 802 (2d Cir. 1986); see also Roberts v. Rhode Island, 239 F.3d 107, 113 (1st Cir. 2001) (Roberts II) (stating that reasonable suspicion can be based on "observations of a particular inmate during a less invasive pat-down frisk and clothing search, or based on contraband found during that search").

-25-

ask whether existing case law gave the defendants fair warning that their conduct violated the plaintiff's constitutional rights." Suboh v. Dist. Attorney's Office of the Suffolk Dist., 298 F.3d 81, 93 (1st Cir. 2002). Our colleagues describe this inquiry as an archeological dig, yet focus on only the top and bottom layers of the excavation. See Swain v. Spinney, 117 F.3d 1 (1st Cir. 1997); Arruda v. Fair, 710 F.2d 886 (1st Cir. 1983). Our colleagues choose to ignore the cases that lie in the layers in between, thereby omitting consideration of relevant precedent. A proper qualified immunity analysis requires a court to look "at all available case law." Hatch v. Dep't for Children, Youth and Their Families, 274 F.3d 12, 23 (1st Cir. 2001). We will therefore briefly trace the development of this circuit's reasonable suspicion standard as it applies to strip searches.

The place to start is the Supreme Court's decision in Bell v. Wolfish, 441 U.S. 520 (1979). In that case, the Court upheld a strip and visual body cavity search of pretrial detainees who had contact with prison visitors. Id. at 560. In doing so, the Court conducted an analysis that balanced the need for the searches against the invasion of personal rights. Id. Although the Court said that the practice of strip searching individuals "instinctively gives us the most pause," it found the searches constitutional because of the security needs of the prison, i.e., the realistic possibility that contraband could pass from visitor

-26-

to detainee.  Id. at 558.  But the Court was clear to delineate the scope of its holding:

> [W]e deal here with the question whether visual body-cavity inspections . . . can ever be conducted on less than probable cause. Balancing the significant and legitimate security interests of the institution against the privacy interests of the inmates, we conclude that they can.

Id. at 560 (emphasis in original).  In other words, Bell established the ceiling; it made clear that prison officials did not necessarily need probable cause to strip search pretrial detainees.  But Bell left the floor undefined.  Still unanswered was the question of whether prison officials needed any level of particularized suspicion that detainees were carrying contraband or weapons or in a position to receive them from others before conducting strip searches.

Our early cases applying Bell to the prison environment dealt largely with situations involving prison visitors.  In one of our first prison visitor cases, Blackburn v. Snow, 771 F.2d 556 (1st Cir. 1985), we held that:

> [T]he Constitution requires a more particularized level of suspicion to justify the humiliating and intrusive searches conducted here. While we need not define here precisely what level of individualized suspicion is required . . . a rule unabashedly requiring none cannot be reconciled with the Fourth Amendment.

Id. at 567; see also Cochrane v. Quattrocchi, 949 F.2d 11, 13 (1st Cir. 1991).  It is also noteworthy that we surveyed the legal

landscape as it existed at the time and grouped arrestees into the category of strip search scenarios in which particularized suspicion was necessary. See Blackburn, 771 F.2d at 565. This grouping was merely a foreshadowing of things to come.

In Wood v. Clemons, 89 F.3d 922 (1st Cir. 1996), we clarified that the level of particularized suspicion required before subjecting prison visitors to strip searches was "reasonable suspicion." Id. at 929. We said that "a strip search cannot be justified absent some quantum of individualized suspicion. In determining the level of individualized suspicion . . . courts have converged upon one common benchmark: the standard of 'reasonable suspicion.'" Id. at 928 (emphasis in original) (citations omitted).

Our cases addressing the reasonable suspicion standard in the context of strip and visual body cavity searches were not limited to prison visitors. We required reasonable suspicion for strip searches at border crossings. See United States v. Uricoechea-Casallas, 946 F.2d 162, 166 (1st Cir. 1991). And most significantly for this case, we held in Swain v. Spinney, 117 F.3d 1 (1st Cir. 1997), that there must be reasonable suspicion to conduct strip searches of arrestees. Id. at 7.

In Swain, we examined our prior cases dealing with prison visitors and border searches, as well as relevant cases from other circuits. We concluded that "it is clear that at least the

-28-

reasonable suspicion standard governs strip and visual body cavity searches in the arrestee context as well." Id. This ruling was consistent with cases from numerous other circuits.[6]

Our brethren mischaracterize the holding in Swain. They paraphrase Swain as holding that reasonable suspicion is "ordinarily" required for arrestees and that strip searches "ought not lightly to be indulged." We respectfully disagree with our colleagues' description of Swain's holding. Swain's holding is clear and unqualified. Swain does not say that reasonable suspicion is only sometimes required. Rather than paraphrase the words of Swain, we shall quote its holding directly: "A strip and visual body cavity search of an arrestee must be justified, at the least, by a reasonable suspicion." 117 F.3d at 5. It is hard to imagine a more clear statement of the law.

Our colleagues fail to mention that Swain contained another holding that is especially relevant to this case. When analyzing the issue of qualified immunity we stated:

---

[6]See Justice v. City of Peachtree City, 961 F.2d 188, 193 (11th Cir. 1992); Masters v. Crouch, 872 F.2d 1248, 1255 (6th Cir. 1989), cert. denied, 493 U.S. 977 (1989); Weber v. Dell, 804 F.2d 796, 802 (2d Cir. 1986), cert. denied, 483 U.S. 1020 (1987); Jones v. Edwards, 770 F.2d 739, 742 (8th Cir. 1985); Stewart v. Lubbock County, Tex., 767 F.2d 153, 156-57 (5th Cir.), cert. denied, 475 U.S. 1053 (1985); Giles v. Ackerman, 746 F.2d 614, 618 (9th Cir. 1984), cert. denied, 471 U.S. 1053 (1985); Hill v. Bogans, 735 F.2d 391, 394 (10th Cir. 1984); Mary Beth G. v. City of Chicago, 723 F.2d 1263, 1273 (7th Cir. 1983); Logan v. Shealy, 660 F.2d 1007, 1013 (4th Cir. 1981), cert. denied, 455 U.S. 942 (1982).

Furthermore, while some courts have suggested that a _higher_ standard may be necessary to justify a strip search and visual body cavity inspection, it was clearly established at the time of the search [May 18, 1993] that the Fourth Amendment requires _at least_ a reasonable suspicion to conduct these types of searches.

_Id._ (emphasis in original). This ruling too was in accord with decisions by other circuits.[7]

In short, _Swain_ states unequivocally that reasonable suspicion is required to strip search arrestees and that this requirement was clearly established as early as 1993, well before the dates in question here. These rulings were in conformity with circuits across the country.

Despite this overwhelming precedent, our colleagues claim that _Swain_'s holdings could not have given the defendants fair

---

[7]_See_ _Chapman_ v. _Nichols_, 989 F.2d 393, 398 (10th Cir. 1993) (holding that it was clearly established that a strip search policy applied to minor offense detainees without particularized reasonable suspicion was unlawful); _Masters_, 872 F.2d at 1255 ("The decisions of all the federal courts of appeals that have considered the issue reached the same conclusion: a strip search of a person arrested for a traffic violation or other minor offense not normally associated with violence and concerning whom there is no individualized reasonable suspicion that the arrestee is carrying or concealing a weapon or other contraband, is unreasonable. We believe the right of such a person to be free of such a search was 'clearly established' on October 21, 1986."); _Weber_, 804 F.2d at 803 (denying qualified immunity for defendants who performed suspicionless strip searches on arrestees because "at least eleven circuit court decisions . . . hold similar policies unconstitutional"); _Jones_, 770 F.2d at 742 n.4 (denying defendants qualified immunity because the Fourth Amendment's protection against suspicionless strip searches of arrestees was well established).

warning that the reasonable suspicion standard would apply to them.
They say that Swain involved an arrestee who was held alone in a
single cell, whereas the plaintiffs in this case were commingled
with other prisoners. Admittedly, our precedent does not speak to
commingling specifically. But that fact does not mean that the
defendants are entitled to qualified immunity. See Hatch, 274 F.3d
at 23 (although "[o]ur own precedents are . . . inconclusive," the
law was clearly established by "an emerging body of decisional law
outside our own circuit"). Commingling may not always pose a
security risk. It is not commingling, per se, that presents a
security problem; it is commingling that involves a risk of illegal
traffic among the commingled inmates.

As early as Blackburn, we rejected the argument that "the
security needs of a prison can, standing alone, properly justify
the 'complete withdrawal' of Fourth Amendment rights from all who
enter [a prison]." 771 F.2d at 563 (emphasis in original); see
also Logan, 660 F.2d at 1013 ("An indiscriminate strip search
policy routinely applied to detainees . . . cannot be
constitutionally justified simply on the basis of administrative
ease in attending to security considerations.").

Cases from other circuits are more explicit in rejecting
the commingling argument advanced by the defendants.[8] Most notable

_____

[8]See Walsh v. Franco, 849 F.2d 68, 69 (2d Cir. 1988) (ruling
that a blanket strip search of all misdemeanor arrestees was not
permissible simply because those arrestees were commingled among

-31-

is the Sixth Circuit's holding in Masters v. Crouch, 872 F.2d 1248

(6th Cir. 1989):

> [T]he fact of intermingling [with other prison inmates] alone has never been found to justify such a search without consideration of the nature of the offense and the question of whether there is any reasonable basis for concern that the particular detainee will attempt to introduce weapons or other contraband into the institution.

Id. at 1254. In short, the cases from other circuits, when read in

conjunction with our own precedent, would not permit a reasonable

prison official to conclude that minor offense arrestees could be

strip searched without reasonable suspicion simply because the

prison officials decide to mix the arrestees with other prisoners.

Our colleagues say that Swain could not have provided

fair warning for another reason. According to our brethren, Swain,

as well as the cases from other circuits upon which it relied,

involved local jails rather than prisons, like the ACI. The

distinction between jails and maximum security prisons is a crucial

leg upon which our colleagues' opinion rests. It is here that

---

arraigned inmates); Giles v. Ackerman, 746 F.2d 614, 617-18 (9th Cir. 1984) ("Defendants' heavy reliance on the intermingling of its temporary detainees with the general [jail] population is misplaced because such intermingling is both limited and avoidable.")(citation and internal quotation marks omitted) (alteration in original); Chapman, 989 F.2d at 396 (rejecting the defendant's argument "that the invasion posed by his policy is justified by the need for jail security because women detainees must be incarcerated in one cell with the general jail population"); Hill, 735 F.2d at 394 (rejecting intermingling argument because "intermingling is only one factor to consider in judging the constitutionality of a strip search").

their incomplete archeological excavation which we mentioned earlier becomes important. The cases that our colleagues ignored involved the early development of our reasonable suspicion standard as it applied to strip searches of prison visitors. At issue in those cases were both jails and prisons. See Wood, 89 F.3d at 925 (prison); Blackburn, 771 F.2d at 559 (county jail).

Even more relevant is the fact that one of those cases dealt with the ACI. See Cochrane, 949 F.2d at 12. In Cochrane, we vacated a judgment granting directed verdicts for ACI officials defending the strip search of an inmate's daughter. We said that:

> [A]bsent any evidence that appellant ever violated a prison visitation rule, or even supplied Cochrane with drugs, a reasonable juror could have concluded that Cochrane's contraband drugs were supplied by prison officials or other inmates. Thus, the jury could have found that the strip search of appellant was unreasonable because it was based on no "individualized suspicion."

Id. at 13 (emphasis in original). Our colleagues maintain that the defendants were justified in believing that no reasonable suspicion was required in this case in part because the defendants "must maintain institutional security in the most difficult of settings." Yet the same setting and security considerations were not enough to defeat the requirement for individualized suspicion in Cochrane. We do not understand on what legal basis our colleagues can now say that those same security needs made the defendants' unconstitutional strip searches reasonable. Certainly the

-33-

defendants had fair warning that the reasonable suspicion standard would be applied to them because, in fact, they had already been held to that standard in the past.

Of course, one difference between Cochrane and the present case is that Cochrane involved prison visitors, not minor offense arrestees. But this fact does not help the defendants; if anything, it further highlights why the defendants had fair warning that their strip search policies were unreasonable.

The Supreme Court has explained that prison visitors "invite a host of security problems" because they can pass weapons and contraband "to an inmate unnoticed by even the most vigilant observers." Block v. Rutherford, 468 U.S. 576, 586 (1984). It is well recognized, however, that individuals arrested for non-violent, non-drug related minor offenses do not present the same security risk as prison visitors. See Roberts II, 239 F.3d at 111; Giles, 746 F.2d at 617. This is because arrests, unlike visits, are not planned events. They are random and do not afford an arrestee the opportunity to hatch a scheme to smuggle contraband into a prison. As the Second Circuit has explained:

> It is far less obvious that misdemeanor arrestees frequently or even occasionally hide contraband in their bodily orifices. Unlike persons already in jail who receive contact visits, arrestees do not ordinarily have notice that they are about to be arrested and thus an opportunity to hide something. For the exceptions--for example, a person who is allowed to visit the bathroom unescorted

> before an arrest--reasonable suspicion may
> well exist.

Shain v. Ellison, 273 F.3d 56, 64 (2d Cir. 2001). Our brethren overlook the important fact that the Court in Bell authorized strip searches of detainees only after the detainees had come into contact with prison visitors. See 441 U.S. at 558. The present case involves people brought to the ACI because they were arrested, sometimes mistakenly as the record reveals, for non-violent, non-drug related minor offenses. They did not come into contact with prison visitors.

Our colleagues concoct a hypothetical situation in which an inmate arranges for an outsider to bring weapons or contraband inside the prison by staging an incident that would lead to the outsider being arrested for a minor offense. With due respect, this is chimerical. The only case our colleagues have exhumed to support their scenario is Watt v. City of Richardson Police Dep't, 849 F.2d 195 (5th Cir. 1988). They claim Watt stands for the idea that "a suspect jailed even temporarily on a minor offense could have the opportunity, if not searched, to smuggle weapons or contraband." Id. at 198. The very next sentence from Watt, however, shows that the quote upon which they rely is applicable only to those arrestees charged with weapons, shoplifting or drug offenses or those with a history of such offenses. See id. ("Limiting the searches generally to those offenders charged with or having a criminal history of narcotics, shoplifting or weapons

-35-

charges is not an irrational attempt to foster jail security . . . ."). Watt does not support our colleagues' theory that non-violent, non-drug related minor offense arrestees will conduct coordinated smuggling schemes to infiltrate prisons with contraband and weapons.

Perhaps more importantly, there is no evidence in the record to support our colleagues' hypothetical. In fact, the record undermines it. At no time has the ACI ever found weapons or contraband in an arrestee's rectum or genital area. Roberts II, 239 F.3d at 112 n.6. Only on one occasion has the ACI found contraband in the body cavity of a minor offense arrestee. Id. In that instance, the arrestee was hiding a bag of drugs in his mouth. Id. All the other contraband that the ACI has found on minor offense arrestees has been discovered in their clothing. It is obvious that the intrusive and degrading searches that the ACI chose to institute were not required to find this contraband. Id.

No historical analysis of our strip search cases would be complete without a close examination of our holding in Arruda v. Fair, 710 F.2d 886 (1st Cir. 1983). Our colleagues say that Arruda is a case with "considerable force" because it "reasonably can be read as saying that the risk that any prisoner in a maximum security facility might receive weapons or contraband from visitors, renegade guards, or others is enough to justify a blanket strip search policy." (emphasis added). Characterized in this

manner, <u>Arruda</u> forms another critical leg upon which our colleagues' opinion stands. Their expansive reading of <u>Arruda</u> is unwarranted. <u>Arruda</u> is a totally different case than what we face here. It is so different that no reasonable official could have read <u>Arruda</u> to authorize suspicionless strip searches of minor offense arrestees. This is true for three reasons.

First, <u>Arruda</u> was decided twenty years ago and, as we have already discussed, our cases since <u>Arruda</u> have made clear that reasonable suspicion is required to strip search arrestees. <u>See</u> <u>Swain</u>, 117 F.3d at 7.

Second, <u>Arruda</u> was a case involving "particularly dangerous prisoners." 710 F.2d at 887. These prisoners were convicted felons assigned to a special cell block, which we described as a "'prison within a prison,' designed to hold the most dangerous inmates." <u>Id.</u> The plaintiff himself was assigned to this special cell block for assaulting another prisoner. <u>Id.</u> In addition, the plaintiff testified that, while a prisoner, he possessed drugs and a weapon. <u>Id.</u> at 888. It is beyond comprehension how the defendants can equate extraordinarily violent convicted felons with people who have been arrested for minor offenses.

Third, and most pertinently, what we identified in <u>Arruda</u> as the "closest question," <u>id.,</u> most analogous to the instant case, was whether prisoners who were convicted felons needed to be

searched en route from cell to library or infirmary, even though accompanied by a guard. Like the misdemeanor arrestees here, there would seem to be no basis for any suspicion that such inmates would possess contraband. The record in Arruda, however, revealed a number of instances when guards were found to be involved in smuggling drugs to prisoners. This caused us to hold, "[G]iven the problem of prison employee involvement with contraband, the district court's conclusion is not unreasonable." Id.; but see id. at 891, 890 (Maletz, J., dissenting in part) ("When one of the primary justifications for strip searches in these circumstances rests on the institution's inability to control its own staff the scales tip decidedly in favor of the inmate. . . . I am constrained to conclude that routine visual strip searches before and after visits to the prison library and prison hospital are unreasonable, absent some level of cause.").

Twenty years have passed since we decided Arruda and the case law barring suspicionless strip searches of minor offense arrestees has proliferated. And Swain, with its clear recognition that a strip search requires reasonable suspicion, has been on the books of this circuit since 1997. The record in this case does not reveal a prison employee drug smuggling problem. There remains only the speculative risk that a non-violent, non-drug related misdemeanant, randomly arrested, might fortuitously be a bearer of

contraband. That is not enough, in our view, to permit the defendants to escape liability for their unconstitutional acts.

The only similarity between Arruda and the present case is that the correctional facilities in both cases are maximum security prisons. This is the vital similarity upon which the defendants' argument relies. Despite the key differences I have described above, our colleagues are persuaded by this single similarity. Our colleagues say that prison officials cannot be expected to anticipate precisely the legal conclusions that we judges will make after full briefing and argument. We agree with that statement as a general matter. But that is not to say that prison officials have no responsibility to analyze the law. All of the individual defendants here are high level prison officials.[9] They are not entry-level prison guards who have no access to legal advice and have superiors who have failed to supply any training on constitutional law whatsoever. The defendants in this case are the superiors and should be held to the standard of a "reasonably competent public official [who] should know the law governing his conduct." Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982). The qualified immunity analysis is based on an objective standard. See

---

[9]The individual defendants include the former and current director of the Rhode Island Department of Corrections, the former and current warden of the Intake Services Center at the ACI, the warden of the women's facility at the ACI, and the chief of recruitment and training at the Rhode Island Department of Corrections.

<u>Suboh</u>, 298 F.3d at 95. This necessarily implies some informed and professional analysis. Merely to take refuge in the concept that the ACI is a maximum security prison, without identifying any realistic distinction between the situation in <u>Arruda</u> and the situation that the defendants were confronted with at the ACI, falls far short of any credible analysis of the state of the law both within and outside this circuit.

We close our review of the relevant legal history regarding strip searches with an important observation. Our colleagues do not cite to a single case which permits suspicionless strip searches of non-violent, non-drug related minor offense arrestees. It is quite amazing that they can claim the law is ambiguous but fail to provide a single case that directly supports their position. The only case our colleagues offer is <u>Covino</u> v. <u>Patrissi</u>, 967 F.2d 73 (2d Cir. 1992). But that case, as our colleagues readily admit, is not on point. The plaintiff in <u>Covino</u> was not arrested for non-violent, non-drug related minor offenses like the plaintiffs in this case. He was arrested for kidnaping a child under the age of sixteen and was ultimately sentenced to 20 to 35 years in prison. <u>Id.</u> at 75 n.1. In addition, the prison superintendent in <u>Covino</u> testified that "occasionally contraband and drugs were found secreted in an inmate's rectum." <u>Id.</u> at 79. As we have already explained, the evidence in this case is to the contrary.

Without direct legal support, our brethren are forced to argue that generalized statements from certain cases made the law so ambiguous that the defendants could not have had fair warning. Our colleagues argue, for example, that there exists "a separate line of cases [that] has emphasized the need to defer to the judgment of correctional officials in addressing institutional security needs." If these types of sweeping statements are enough to shield prison officials from liability for their illegal actions, then there is the significant risk that qualified immunity will always attach.

It is this concern that brings us to our final point. Up to now, we have argued that our colleagues analysis of our legal history is incomplete and untenable. This is not the only flaw in their opinion. We are deeply troubled by the weight our colleagues give to our statement in Roberts II that institutional security concerns in this case "fall somewhere between" those exhibited in Swain and Arruda. 239 F.3d at 111. Our colleagues describe this statement as an acknowledgment that the ACI's strip search policy fell into a "gray area" of the law. We respectfully disagree. The Roberts II statement merely recognizes the obvious: that the facts of the present case fall somewhere between those of Swain and Arruda. Such an observation is not surprising. Indeed, most cases will fall somewhere between Swain and Arruda because those two cases represent the opposite ends of the spectrum. Swain was a

-41-

case involving an arrestee who was placed in a cell in a local police station. In contrast, Arruda involved extraordinarily violent convicted felons who were confined to a special security section of a maximum security prison. What our colleagues have done is to construe a dictum probably intended to soften criticism of the prison officials into a sweeping carte blanche, protecting officials for a wide swath of conduct elsewhere long since forbidden.

Placing so much weight on the Roberts II statement runs the risk of creating an impenetrable defense for government officials. Our colleagues' reliance on the Roberts II statement implies that qualified immunity will only be denied in this circuit when the facts of the case at bar are the same as those in previously decided cases. This risk is compounded by our colleagues' statement that Swain could not give the defendants fair warning because it is not "a very exact match" to the facts of this case.

Such reasoning flouts the Supreme Court's holding in Hope v. Pelzer, 536 U.S. 730 (2002). In Hope, the Court admonished the Eleventh Circuit for finding the law clearly established only when the facts of previous cases were "fundamentally similar" to the present case. Id. at 739. The Court said that such an approach was a "rigid gloss on the qualified immunity standard . . . [that] is not consistent with our cases." Id. The Court explained that

"officials can still be on notice that their conduct violates established law even in novel factual circumstances," and that "[a]lthough earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. The same is true of cases with 'materially similar' facts." Id. at 741.

Our colleagues respond by saying that "[i]t is the absence of clear guidance, not the absence of a perfect precedential match, that makes qualified immunity appropriate here." In short, they reject Swain as giving "clear guidance" because of factual differences, while claiming allegiance to Hope's ruling that "fundamentally similar" facts are not necessary. This seems to us an attempt to have it both ways.

Our colleagues may well be correct that the strip search policy at issue in this case, and others like it, are "dead and buried." But their qualified immunity analysis will live on; it will undoubtedly be used in future cases involving other important constitutional rights. The qualified immunity defense is "an attempt to balance competing values: not only the importance of a damages remedy to protect the rights of citizens . . . but also 'the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority.'" Harlow, 457 U.S. at 807

(quoting <u>Butz</u> v. <u>Economou</u>, 438 U.S. 478, 504-06 (1978)). By finding ambiguity in our cases where there is none, and by implying that previous cases must be "a very exact match" before they can give fair warning for purposes of the qualified immunity analysis, our brethren have tipped the balance away from the Constitution. They have gone far toward granting absolute immunity under the cloak of qualified immunity. We believe that this court is obliged not only to give due deference to the judgment of government officials but to insist that the constitutional rights of individuals be vigilantly protected.

If the bar to a remedy is set too high, then constitutional rights are in jeopardy. Government officials will have less incentive to change their illegal policies on their own accord because the deterrent effect of damages is lacking. Aggrieved individuals will have less incentive to challenge those policies because monetary compensation for their harms is unavailable. In the end, unconstitutional government action is more likely to go unchanged. That is our ultimate concern.